74 Cal.Rptr.2d 652 (1998)
63 Cal.App.4th 1071
CAT PARTNERSHIP et al., Plaintiffs and Respondents,
v.
COUNTY OF SANTA CRUZ, Defendant and Appellant.
TELE-COMMUNICATIONS, INC., Plaintiff and Respondent,
v.
COUNTY OF SANTA CRUZ, Defendant and Appellant.
No. H016374.
Court of Appeal, Sixth District.
April 13, 1998.
As Modified on Denial of Rehearing May 11, 1998.
Review Denied July 15, 1998.
*654 Rutan & Tucker and William M. Marticorena, Costa Mesa, for Defendant and Appellant.
Shartsis, Friese & Ginsburg, Douglas Mo and Tracy Salisbury, San Francisco, Gordon & Goddard and Paul M. Gordon, Oakland, for Plaintiffs and Respondents and for Plaintiff and Respondent.
ELLA, Associate Justice.
Respondent cable operators filed actions seeking a property tax refund. (Rev. & Tax. Code, § 5141.)[1] They challenged the decision of the Santa Cruz Assessment Appeals Board ("AAB") to tax certain Rate Protection Provisions included as part of the cable operators' franchise agreements with local governments. The trial court determined that the Rate Protection Provisions were enforceable restrictions and therefore not subject to taxation. It excised the Rate Protection Provisions from the AAB's calculations but left the rest of the AAB's determination intact.
On appeal, the County of Santa Cruz argues that (1) the cable operators did not exhaust their administrative remedies; (2) the Rate Protection Provisions were not enforceable restrictions but "in kind" payments; and (3) the trial court erred in failing to remand the matter to the AAB.
We will conclude that (1) the exhaustion requirement was satisfied; (2) the Rate Protection Provisions were enforceable restrictions; (3) the trial court did not err in failing to remand the matter to the AAB. Accordingly, we will affirm the judgment.

Factual Background
This case concerns the cable television system serving the Cities of Santa Cruz and Scotts Valley and certain unincorporated portions of Santa Cruz County (the "cable system"). The cable system reaches customers by transmitting television signals via cable from a central distribution point, commonly referred to as a headend, to each customer's home. About two-thirds of the cable is located on public land, and about one-third is situated on private land.
The cable system operator must obtain permission from the local government to operate the cable system within the local government boundaries and to place its cable on public land. (47 U.S.C. § 541; Gov.Code, § 53066.) Both authorizations are set forth within the franchise agreement between the local government and the cable system operator.
The Santa Cruz County cable television market is unique due to limited over-the-air television reception. Because of this limitation, there have been significantly higher than average penetration rates since the system's construction. In fact, in an unrelated judicial proceeding, it was determined that the Santa Cruz area constituted a "captive market" and that the Santa Cruz cable operator therefore possessed a monopoly.
The uniqueness of the Santa Cruz market prompted the local government to attempt to quantify the profitability of the Santa Cruz cable franchises by comparing them with franchises serving communities with viable over-the-air reception. The local government sought to obtain a portion of the economic surplus for itself and for subscribers by implementing rate controls as part of the franchise agreement.
With this in mind, the local government solicited bids for a cable provider. Negotiations with Group W, the prior cable operator, had disintegrated. In 1986, Greater Santa Cruz Cable TV Associates ("GSCC") was awarded the franchise. As part of the *655 franchise agreement, GSCC agreed to controls on the rates it could charge for its cable service.[2]
On June 18, 1987, respondent CAT partnership acquired the cable system. Respondent Tele-Communications, Inc. ("TCI") was one of three partners in CAT Partnership. On September 9, 1989, the cable system was acquired by its current owner, respondent UACC Midwest, Inc. (UACC). UACC is a subsidiary of TCI. When UACC assumed ownership of the cable system franchise, it also agreed to restrictions (the Rate Protection Provisions) on the rates it could charge for cable service.
The Santa Cruz County Assessor calculated the property tax owed by the cable operator for the possessory interest in the cable system.[3] Respondents disagreed with the Assessor's decision. CAT and UACC appealed the Assessor's property tax determination to the Santa Cruz County Assessment Appeals Board.
The AAB used an income approach to determine the fair market value of the cable operator's possessory interest in the cable system. The AAB based its determination upon the annual rent which it interpreted as the economic rent. The AAB found that economic rent constituted the amount that would be paid in money or in kind for the right to use the real property which constituted the possessory interest. (Property Tax Rule 21(g).)[4] With respect to the amounts offered in kind for the franchise, the AAB considered a number of concessions and services. Among others, these included Subscriber Rate Protection Provisions and Senior Citizen and Handicapped Rate Protections (collectively the Rate Protection Provisions).[5]
In its decision, the AAB recognized that the tax owed could be reduced by enforceable restrictions upon the property. However, the AAB found that the in kind concessions or services were not enforceable restrictions. The AAB reasoned that the concessions and services were not required by regulation but were offered by bidders as part of the franchise bidding process. The AAB also found that the concessions and services listed were not "land use restrictions" *656 needed to implement a public policy of encouraging and maintaining effective land use planning. The AAB concluded that only these types of land use restrictions were excludable in its calculation of the economic rent.
The cable operators disagreed with the AAB's decision. They alleged multiple errors by the AAB, including the alleged erroneous taxation of the Rate Protection Provisions. In 1995, CAT and UACC filed a refund claim with the Santa Cruz County Board of Supervisors. In 1996, TCI filed a virtually identical claim for a refund. The claim for refund was denied by the Board of Supervisors.
CAT Partnership and UACC filed a complaint in superior court seeking a property tax refund. (§ 5141.) TCI filed a similar action and the two claims were consolidated. CAT Partnership, UACC and TCI all argued that it was improper to tax the Rate Protection Provisions because the provisions constituted enforceable restrictions.[6]
After considering the evidence, the trial court ruled that the assessment of the Rate Protection Provisions was erroneous, void and illegal in its entirety. Since the AAB had assigned a separate taxable value to the Rate Protection Provisions, the trial court subtracted that value from the AAB's calculation of the in-kind portion of the economic rent and adjusted the figures with the Rate Protection Provisions excised. The trial court left the rest of the AAB property tax determination intact.[7]
The County of Santa Cruz appeals the trial court's decision.

Standard of Review
We review questions of fact resolved in an administrative proceeding under the substantial evidence standard. Questions of law are subject to de novo review. (Bret Harte Inn, Inc. v. City and County of San Francisco (1976) 16 Cal.3d 14, 23, 127 Cal. Rptr. 154, 544 P.2d 1354.)
The AAB is required to use a reasonable method in estimating the value of property. (Property Tax Rule 3; De Luz Homes, Inc. v. San Diego County (1955) 45 Cal.2d 546, 563-564, 290 P.2d 544; Texaco, Inc. v. County of Los Angeles (1982) 136 Cal.App.3d 60, 186 Cal.Rptr. 16; Shubat v. Sutter County Assessment Appeals Bd., supra, 13 Cal. App.4th 794, 17 Cal.Rptr.2d 1.) The AAB's decision about which valuation methodology to use is a question of law subject to challenge if the valuation method is arbitrary, in excess of discretion, or in violation of specific standards imposed by law. (Bret Harte Inn, Inc. v. City and County of San Francisco, supra, 16 Cal.3d 14, 23, 127 Cal.Rptr. 154, 544 P.2d 1354.) Accordingly, the selection of a valuation method must be sustained unless it is arbitrary, in excess of discretion, or in violation of law. (GTE Sprint Communications Corp. v. County of Alameda (1994) 26 Cal.App.4th 992, 1002, 32 Cal.Rptr.2d 882.)

Discussion

I. Exhaustion of Administrative Remedies

Appellant argues that respondent TCI failed to exhaust its administrative remedies because TCI was not an applicant in the AAB proceeding.[8] As we explain below, we disagree.
Section 1603 permits "the party affected or his or her agent" to prosecute an appeal before the AAB.[9] TCI argues that *657 CAT and UACC were "parties affected" and therefore it was permissible for CAT and UACC to be applicants before the AAB even though TCI was not. We need not determine whether CAT and UACC may be characterized as "parties affected" pursuant to 1603. This is because we conclude that the exhaustion requirement is satisfied in these particular circumstances.
The requirement of exhaustion of administrative remedies is a fundamental prerequisite of judicial jurisdiction in all California administrative agency matters. (Abelleira v. District Court of Appeal (1941) 17 Cal.2d 280, 292, 109 P.2d 942; Morton v. Superior Court (1970) 9 Cal.App.3d 977, 982, 88 Cal.Rptr. 533; County of Contra Costa v. State of California (1986) 177 Cal.App.3d 62, 77, 222 Cal.Rptr. 750.) The rule prevents premature judicial interference with the actions of the legislative branch, acting through statutorily authorized administrative agencies. It also permits disputes to be reviewed in the first instance by agencies presumably specially equipped to consider the matters consigned to them and more expert in such matters than courts of general jurisdiction. (See e.g. Robinson v. Department of Fair Employment & Housing (1987) 192 Cal.App.3d 1414, 1416-1417, 239 Cal.Rptr. 908; Yamaha Motor Corp. v. Superior Court (1986) 185 Cal.App.3d 1232, 1240, 230 Cal.Rptr. 382.)
The exhaustion doctrine is favored because it facilitates development of a complete record drawing on administrative expertise and also fosters a preliminary administrative sifting process which in turn fosters judicial economy. (Yamaha Motor Corp. v. Superior Court, supra, 185 Cal.App.3d at p. 1240, 230 Cal.Rptr. 382; Bozaich v. State of California (1973) 32 Cal.App.3d 688, 108 Cal.Rptr. 392.) Accordingly, it follows that the more comprehensive the administrative remedy, the more useful the agency findings and determinations will be if judicial enforcement proves necessary. Similarly, the more comprehensive the administrative remedy, the more clear it is that the Legislature intended that the agency have precedence.
In this case, the policies underlying the exhaustion requirement were fully satisfied even though TCI was not a formal applicant in the proceeding before the AAB. The underlying issues were thoroughly litigated before the AAB. The AAB undertook an extensive evaluation of the evidence. There was never any question that the evaluation applied equally to TCI, as well as to CAT and UACC. Indeed, TCI was one of three partners in CAT and also a successor in interest to CAT. Thus, this case does not implicate premature judicial interference with the AAB's jurisdiction or disclose a failure to fully utilize administrative expertise. Quite clearly, the issue of the property tax owed by the cable system owners was extensively and completely examined by the AAB. Moreover, in the proceeding before the AAB, the AAB treated TCI as if it were an applicant. The AAB decision listed TCI in the caption and designated TCI as one of the applicants, along with CAT and UACC. In fact, appellant itself referred to TCI as an applicant. Given this situation, to conclude that TCI failed to exhaust its administrative remedies would exalt form over substance and require that we ignore the reality of what happened before the AAB. For these reasons, appellant's argument that TCI failed to exhaust its administrative remedies is without merit.

II. Taxation of Rate Protection Provisions

Having rejected appellant's exhaustion argument, we next determine whether the Rate Protection Provisions are "in kind" payments to the local government or enforceable restrictions. We will conclude the provisions are enforceable restrictions and therefore they should not have been considered in the AAB's economic rent calculation.

A. Background Tax Law

We begin with the applicable tax law principles. The franchise right to do business is a valuable but nonassessable portion of the franchise. (§ 107.7; County of Stanislaus v. Assessment Appeals Bd. (1989) 213 Cal. App.3d 1445, 1454, 262 Cal.Rptr. 439; Shubat, supra, 13 Cal.App.4th 794, 802, 17 Cal. Rptr.2d 1.) The franchise right to locate cable on public streets and rights of way is a possessory interest in real property. (§ 107.7; Cox Cable San Diego, Inc. v. County *658 of San Diego (1986) 185 Cal.App.3d 368, 229 Cal.Rptr. 839.) Because the possessory interests are interests in real property, their assessment is governed by principles set forth in the California Constitution.
The California Constitution provides that all property "shall be assessed at the same percentage of fair market value." (Cal. Const., art. XIII, § 1, subd. (a).) "Fair market value" or "full cash value" is the "appraised value of real property when ... a change in ownership has occurred after the 1975 assessment." (Cal. Const., art. XIIA, § 2.)[10] "Full cash value" or "fair market value" is defined as "the amount of cash or its equivalent that property would bring if exposed for sale in the open market under conditions in which neither buyer nor seller could take advantage of the exigencies of the other and both with knowledge of all of the uses and purposes to which the property is adapted and for which it is capable of being used and of the enforceable restrictions upon those uses and purposes." (§ 110; see also Dennis v. County of Santa Clara (1989) 215 Cal.App.3d 1019, 1026, 263 Cal.Rptr. 887; McDonnell Douglas Corp. v. County of Los Angeles (1990) 219 Cal.App.3d 715, 722, 268 Cal.Rptr. 294.)
In determining the fair market value of the possessory interest for purposes of assessing property tax, the AAB may utilize three methods. These are: (1) the comparable sales method; (2) the income method (including but not limited to, capitalizing rent); or (3) the cost method. (§ 107.7, subd. (a); see also De Luz Homes, Inc. v. County of San Diego, supra, 45 Cal.2d 546, 563-565, 290 P.2d 544; Bret Harte Inn, Inc. v. City & County of San Francisco, supra, 16 Cal.3d at p. 23, 127 Cal.Rptr. 154, 544 P.2d 1354.)
Under the comparable sales method, the assessor analyzes and correlates the sales prices of other transactions involving comparable properties. (Bret Harte Inn, Inc., supra, 16 Cal.3d at p. 23, 127 Cal.Rptr. 154, 544 P.2d 1354.) If the income method is used, then the assessor capitalizes the sum of future income of the property, subject to an allowance for the risk of receiving partial income or no income. (De Luz Homes, Inc. v. County of San Diego, supra, 45 Cal.2d 546, 290 P.2d 544; Bret Harte Inn, Inc., supra, 16 Cal.3d at p. 23, 127 Cal.Rptr. 154, 544 P.2d 1354.) The cost method requires the assessor to subtract depreciation from a figure that reflects cost. (See Property Tax Rule, § 6; Bret Harte Inn, Inc., supra, 16 Cal.3d at p. 23, 127 Cal.Rptr. 154, 544 P.2d 1354.)
The preferred method of valuing a cable television possessory interest is the income method, capitalized to the annual rent, using an appropriate capitalization rate. (§ 107.7, subd. (b)(1).) "Annual rent" is defined as either "that portion of the franchise fee received by the franchising authority that is determined to be payment for the cable television possessory interest for the actual remaining term or the reasonably anticipated term of the franchise or license; or the appropriate economic rent." (§ 107.7, subd. (b)(2), emphasis added.) "Economic rent" is defined as "the amount that would be paid in money or kind for the right to use real property if (1) the contract rent were currently negotiated under the conditions which exist in a free and competitive market, and (2) the fee owner property taxes on the value of the fee." (Property Tax Rule 21(g), emphasis added.)
In determining fair market value, enforceable restrictions upon the property may be taken into account. As already noted, section 110 defines "full cash value" or "fair market value" as "the amount of cash or its equivalent that property would bring if exposed *659 for sale in the open market under conditions in which neither buyer nor seller could take advantage of the exigencies of the other and both with knowledge of all of the uses and purposes to which the property is adapted and for which it is capable of being used and of the enforceable restrictions upon those uses and purposes." (§ 110, emphasis added.) Similarly, section 402.1 directs the assessor to consider "the effect upon value of any enforceable restrictions to which the use of the land may be subjected."[11] (Emphasis added.) Property Tax Rule 2 provides that in determining "fair market value" one must take into account "legally enforceable governmental restrictions" applicable to the subject property. Finally, in discussing the income approach, the Property Tax Rules provide that "(c) The amount to be capitalized is the net return which a reasonably well informed owner and reasonably well informed buyers may anticipate on the valuation date that the taxable property existing on that date will yield under prudent management and subject to such legally enforceable restrictions as such persons may foresee as of that date." (Property Tax Rule, § 8, emphasis added.)
The types of restrictions that constitute enforceable restrictions have been described as virtually any government restriction designed to serve the interest of public health, safety, morals and/or general public welfare. (Cal.State Bd. of Equalization, Assessors Handbook 501, General Appraisal manual (1975) p. 501-506.) As one commentator stated, "Generally, any sort of binding agreement with a government agency should qualify [as an enforceable restriction], whether or not recorded.... Most agreements between the owner and other private persons probably do not qualify." (Ehrman and Flavin, 2 Taxing California Property (3d ed. 1997) § 25:11, p. 19.) Courts have interpreted the term "enforceable restrictions" to refer to government restrictions. (Carlson v. Assessment Appeals Bd. I (1985) 167 Cal.App.3d 1004, 1010, 213 Cal.Rptr. 555; see also Dominguez Energy v. County of Los Angeles (1997) 56 Cal.App.4th 839, 854, 65 Cal. Rptr.2d 766.) In Dominguez Energy v. County of Los Angeles, supra, the court said there is an enforceable restriction when "the land is subject to restrictions imposed by government which affect its value." (Id. at p. 854, 65 Cal.Rptr.2d 766.)

B. AAB's Determination

The AAB decided that section 402.1's reference to "enforceable restrictions" only applied to land use restrictions needed to implement a public policy of encouraging and maintaining effective land use planning. We disagree with the AAB's determination. First, section 402.1's plain language provides that its listed restrictions are not exclusive. In particular, it provides that "These restrictions shall include, but are not limited to, all of the following...." Second, no court has limited section 402.1's reference to "enforceable restrictions" to the meaning utilized by the AAB. Third, an Attorney General Opinion interpreted section 402.1 to apply to rent controls, thereby expressly contradicting the interpretation relied upon by the AAB. (59 Ops.Cal.Atty.Gen. 293 (1976).)
In the Attorney General's opinion, the federal government subsidized a private housing *660 project. The project mortgage was federally insured and HUD paid the mortgagee all interest on the mortgage loan in excess of one percent per annum. In return, the owner of the project executed a regulatory agreement with the federal government which imposed several restrictions upon the owner. Most importantly, the agreement restricted the maximum rental that the owner could charge tenants and curtailed the owner's power to transfer the project.
The Attorney General decided that the restrictions constituted "enforceable restrictions" within the meaning of section 402.1: "There is nothing in the overall context of section 402.1 nor in its legislative history which would suggest that the words `any enforceable restriction to which the us of the land may be subjected' used therein should not be given their natural significance. This being so, it is clear that an enforceable rent limitation would constitute such a restriction upon what would otherwise be a permissible use to which the land may be subjected, to wit: the rental of the property at the maximum rates the open market would allow." (59 Cal.Ops.Atty. Gen., supra, 293, 295.)
The reasoning of the Attorney General Opinion is recognized by the State Board of Equalization. In its Assessors Handbook on the Income Method, it is stated: "If, however, the rent is artificially low because of rent control, it is by government action that the rent is low and it cannot be ignored. Rent control is a restriction on property as certainly as a zoning ordinance is a restriction, and it must be recognized." (Cal.State Bd. of Equalization, Assessors Handbook 501A, The Income Approach to value (1989), p. 501A-9, emphasis added.)[12] Similarly, in the Appraisers Handbook 568, Appraisal of Cable Television, prepared in 1977, it is noted that price controls were the norm. According to the handbook, in using the income valuation approach, the assessor must use the cable operator's actual charges for monthly service because they are "usually limited by the franchiser." (Id. at p. 568-27, 28.)
These authorities demonstrate that the AAB misinterpreted section 402.1 when it decided that section 402.1 was limited to land use restrictions. Besides misapprehending section 402.1, the AAB also overlooked the fact that the enforceable restriction principle is not limited to section 402.1. A general tenet of property tax law is that when land is subject to a restriction which affects its value, then that restriction should be considered in determining the property's fair market value. (§ 110, subd. (a); see also Property Tax Rule, § 8.)[13] This principle is related to the requirement that the land be valued at its highest and best use subject to the condition that the use be one which is legally permissible. (Taxing California Property, supra, § 18:07; see also County of Riverside v. Palm-Ramon Development Co. (1965) 63 Cal.2d 534, 47 Cal.Rptr. 377, 407 P.2d 289.)[14] A use which is forbidden because of an enforceable restriction is generally not a use that is legally permissible.
The AAB also erred in basing its decision upon the fact that respondents were awarded the cable franchise as part of a free and competitive process. Our review of the record reveals that the Rate Protection Provisions were, in effect, a required part of the franchise agreement. The County was not *661 going to award the franchise to a cable operator unless the cable operator agreed to controls on the rates it could charge. In fact, the County's expressed objectives during the franchising process included obtaining affordable pricing of basic cable television services. The AAB's emphasis upon a free and competitive process ignores this fundamental reality.
The AAB's focus upon the free and competitive franchise bidding process seems tied to a belief that the Rate Protection Provisions were not enforceable restrictions because the cable system operators, voluntarily entered into the franchise agreements. In this respect, we think the AAB confused the property tax treatment of property subject to a private agreement with the property tax treatment of property subject to an agreement with the government. For example, if two private parties enter into a lease and the rent is lower than what might be market supported, then the property tax calculation will generally be based upon the market supported rent, rather than the rent required under the lease. (See e.g. Clayton v. County of Los Angeles (1972) 26 Cal.App.3d 390, 102 Cal.Rptr. 687; see also Carlson v. Assessment Appeals Bd. I, supra, 167 Cal.App.3d at pp. 1010-1011, 213 Cal.Rptr. 555.) The same rule, however, obviously does not apply here since the agreement was with the local government. After all, it is only governmental enforceable restrictions which affect fair market value. (Carlson v. Assessment Appeals, Bd. I, supra, 167 Cal.App.3d at p. 1011, 213 Cal.Rptr. 555.) In fact, the Opinion of the Attorney General specifically rejected a similar argument. It stated that "the fact that the 236 project owner voluntarily entered into the regulatory agreement with the federal government does not dictate a contrary conclusion. The reference in subdivision (b) [of section 402.1] to `contracts' with governmental agencies makes it clear that restrictions voluntarily assumed were intended to come within the scope of section 402.1." (59 Cal.Ops.Atty.Gen., supra, at p. 295.)
The AAB's reliance upon the free and competitive franchise bidding process also seems tied to the definition of economic rent. As noted, "economic rent" is "the contract rent [which would be] currently negotiated under the conditions which exist in a free and competitive market...." (Property Tax Rule 21(g).) Evidently, the AAB believed this definition validated its emphasis upon the free and competitive franchise bidding process. But the fact that the local government accepted bids from cable operators does not change the fact that the Rate Protection Provisions were a required part of the franchise agreement package nor does it mean that the AAB was free to ignore the enforceable restriction principle in figuring the cable operators' economic rent. (See e.g. El Tejon Cattle Co. v. County of San Diego (1966) 64 Cal.2d 428, 50 Cal.Rptr. 546, 413 P.2d 146 [lease restrictions on use of government property properly taken into account in figuring economic rent].)

C. Appellant's Contentions

Appellant argues the Rate Protection Provisions were "transfer" payments made by respondents to the local government as a valuable part of the consideration for receiving the franchise rights. This argument rests upon the fundamentally unworkable premise that an enforceable restriction, which is in essence a negative covenant, can somehow be transformed into a transfer payment. In trying to support its position, appellant states that "[o]ne would assume that the buyers paid less for the Santa Cruz system based upon the inclusion of price controls than it would have paid had rates been deregulated and the operator was able to fully exploit the market conditions associated with Santa Cruz's `captive market'...." But this argument simply ignores the relation between the Rate Protection Provisions and what the cable system operators actually received. Although appellant maintains that the cable system was more valuable because it was directed at a captive market, the fact is that the Rate Protection Provisions represented the precise way in which the cable operators were prevented from unduly exploiting that captive market. Appellant's argument improperly focuses upon what the cable system owners "gave up" to obtain the franchise instead of focusing on what they "got."
*662 Appellant's entire brief is filled with statements which simply ignore the reality of what happened. For example, appellant states: "First, absent the price control mechanism contained in the Consent Judgment, did the Respondents possess the legal ability to charge rates in excess of those allowed by the Consent Judgment? The undisputed answer to this question is yes. Second, absent the rate control provisions in the Consent Judgment, did the Respondents possess the practical or market receptive ability to charge rates in excess of the Consent Judgment? The Assessor and the AAB said `Yes.'" These hypothetical questions are not particularly useful in advancing appellant's position. This is because the rate controls did exist, were part of an agreement with the local government, and therefore the cable system owners did not have the ability to charge rates in excess of the Rate Protection Provisions. As already noted, it does not matter that the agreements were entered into voluntarily. Further, if we were to accept appellant's position, then similar hypothetical questions could just as easily be applied to zoning restrictions, hazardous waste land use restrictions, or any government-imposed restrictions on the use of real property. The upshot would be to excise the enforceable restriction principle from property tax law.
Accordingly, we conclude the Rate Protection Provisions constitute enforceable restrictions. Just as the rent control provisions restricted the rent the landlord could charge its tenants, so do the Rate Protection Provisions restrict what the cable operators may charge their cable customers. The Rate Protection Provisions constitute a "restriction" on the property, resulting in rates which are lower than what might be market supported absent the government regulation. As such, the AAB should not have included the Rate Protection Provisions in its calculation of the in-kind portion of the economic rent.

III. Whether to Remand to AAB

Appellant argues that the trial court should have remanded the matter to the AAB so that the AAB could recalculate the property tax owed based upon the determination that the Rate Protection Provisions were enforceable restrictions. We disagree.
A remand to the AAB is generally required if the refund determination depends upon an exercise of valuation functions and does not simply involve mathematical computations. (Union Pacific Railroad Co. v. State Bd. of Equalization (1991) 231 Cal. App.3d 983, 1001, 282 Cal.Rptr. 745.) The "cases establish that the key question concerning remand is whether there remain factual determinations to be made in establishing market value." (Prudential Ins. Co. v. City and County of San Francisco, supra, 191 Cal.App.3d 1142, 1161, 236 Cal.Rptr. 869.) Under section 5144, "[i]f the court finds that an assessment is void in whole or in part, it shall render judgment for the plaintiff for the amount of the taxes paid on that portion of the assessment that is found to be void." (See also Parr-Richmond Industrial Corp. v. Boyd (1954) 43 Cal.2d 157, 168, 272 P.2d 16.)
In this case, the valuation method used by the AAB was proper. The error was in the AAB's decision to include the Rate Protection Provisions in its calculation of the economic rent. Because the AAB assigned a separate value to the Rate Protection Provisions, the trial court simply excised that value from the AAB determination and recalculated the economic rent accordingly. Because this recalculation did not involve factual questions, but essentially just involved subtracting a sum from the total inkind portion of the economic rent and adjusting the resulting figures, we do not believe remand to the AAB is required. Appellant contends that if the Rate Protection Provisions are enforceable restrictions then the valuation methodology used by the AAB was fundamentally flawed. But there is no dispute that the income and economic rent approach used by the AAB was proper. Appellant simply seeks to reargue what has already been determined and what it had previously agreed to. Considerations of fairness and judicial economy also support not permitting appellant to reargue its position under the rubric of seeking a different valuation method. (See e.g. Union Pacific Railroad Co. v. State Bd. of Equalization, *663 supra, 231 Cal.App.3d 983, 1001, 282 Cal. Rptr. 745; Prudential Ins. Co. v. City and County of San Francisco, supra, 191 Cal. App.3d at p. 1161, 236 Cal.Rptr. 869.)

Disposition
The judgment is affirmed.
PREMO, Acting P.J., and WUNDERLICH, J., concur.
NOTES
[1] All further unspecified statutory references are to the Revenue and Taxation Code.
[2] In 1984, Group W Cable filed suit challenging the failure to renew its franchise. In May 1988, as part of a settlement, First Amended Franchise Agreements were issued to GSCC and subsequently transferred to respondents as part of the 1988 Stipulation and Consent Judgment which settled the litigation. The 1988 Consent Judgment was amended in 1992 and still governs the provision of cable television services. The Rate Protection Provisions are included within the Consent Judgment.
[3] These values were as follows: (1) June 18, 1987$10,900,000; (2) March 1, 1988$11,118,000; (3) March 1, 1989$11,340,360; (4) April 7, 1989$30,600,000; (5) March 1, 1990 $31,212,000; (6) March 1, 1991$31,836,240; (7) March 1, 1992$32,472,965; (8) March 1, 1993$33,122,424.
[4] All subsequent references to the term "Property Tax Rules" refers to Title 18, California Code of Regulations, Sections 1-1099.
[5] The AAB calculated the economic rent as follows. To calculate the monetary portion of the economic rent, the AAB utilized 5 percent of gross revenues and calculated the revenue stream over a 20-year-term. The AAB then discounted the amounts to a current value. With respect to the amounts offered in kind for the franchise, the AAB figured the undiscounted value of the applicable concessions and services. It then calculated the discounted present value of the in-kind concessions and services. The AAB next totaled the in-kind concessions and added that total to the sum calculated as the monetary portion of the economic rent. The result was the capitalized economic rent valuation. The AAB allocated 50 percent of the capitalized economic rent to the nontaxable right to do business. The other 50 percent of the capitalized economic rent the AAB assigned to the taxable possessory interest. (See e.g. Shubat v. Sutter County Assessment Appeals Bd. (1993) 13 Cal.App.4th 794, 807-808, 17 Cal.Rptr.2d 1.) Accordingly, the AAB divided the capitalized annual rent for each period by two. The result was the AAB's determination of the fair market value of the possessory interest. Pursuant to Revenue and Taxation Code section 51, the adjusted base year value for the possessory interest is limited to a two percent annual adjustment. The AAB adjusted the figures accordingly to result in the taxable fair market values of the possessory interest. The adjusted figures were as follows:

June 18, 1987 $ 8,665,559
March 1, 1988 $ 8,786,639
March 1, 1989 $ 8,962,372
April 7, 1989 $19,888,459
March 1, 1990 $20,266,610
March 1, 1991 $20,671,942
March 1, 1992 $21,085,381
March 1, 1993 $21,507,089

[6] Respondents did not challenge the propriety of including the other in-kind concessions and services in the calculation of the economic rent.
[7] The trial court did correct a math error in the calculation of the possessory interest values.
[8] CAT and UACC were applicants in the proceeding before the AAB. TCI was not. CAT and UACC filed an action for a refund in the superior court (Case No. CV-131333). TCI filed a similar action (Case No. CV-132036). The two cases were consolidated. Because it was determined that TCI was the party that actually paid the tax, the trial court entered judgment for a refund only for TCI in the action brought by it (Case No. CV-132036).
[9] Section 1603 provides, in pertinent part, that "(a) A reduction in the assessment on the local roll shall not be made unless the party affected or his or her agent makes and files with the county board a verified, written application showing the facts claimed to require the reduction and the applicant's opinion of the full value of the property,"
[10] On each lien date after the date of a change in ownership, the Assessor must enroll the lower of (1) the fair market value on the date of the change in ownership (commonly referred to as the "base year value") plus an inflation factor, not to exceed 2 percent per annum or (2) the fair market value as of the lien date. (Cal. Const., art. XIII, § 1, subd. (a).) In this case, the possessory interest must therefore be valued as of June 18, 1987 (the date CAT partnership assumed ownership of the system, including the possessory interest), and each subsequent lien date during CAT's partnership's ownership of the system (March 1, 1988 and March 1, 1989). The possessory interest also must be valued as of April 7, 1989 (the date UACC assumed ownership of the system), and each subsequent lien date at issue (March 1, 1990, March 1, 1991, March 1, 1992, and March 1, 1993).
[11] Under section 402.1, subdivision (a), enforceable restrictions "shall include, but are not limited to, all of the following: ¶ (1) Zoning. ¶ (2) Recorded contracts with governmental agencies other than those provided in Section 422. ¶ (3) Permit authority of, and permits issued by, governmental agencies exercising land use powers concurrently with local governments, including the California Coastal Commission and regional coastal commissions, the San Francisco Bay Conservation and Development Commission, and the Tahoe Regional Planning Agency. ¶ (4) Developmental controls of a local government in accordance with any local coastal program certified pursuant to Division 20 (commencing with Section 30000) of the Public Resources Code. ¶ (5) Developmental controls of a local government in accordance with a local protection program, or any component thereof, certified pursuant to Division 19 (commencing with Section 29000) of the Public Resources Code. ¶ (6) Environmental constraints applied to the use of land pursuant to provisions of statutes. ¶ (7) Hazardous waste land use restriction pursuant to Section 25240 of the Health and Safety Code. ¶ (8) A recorded conservation, trail, or scenic easement, as described in Section 815.1 of the Civil Code, that is granted in favor of a public agency, or in favor of a nonprofit corporation organized pursuant to Section 501(c)(3) of the Internal Revenue Code that has as its primary purpose the preservation, protection or enhancement of land in its natural, scenic, historical, agricultural, forested, or open-space condition or use."
[12] Assessors Handbooks "have ... been relied upon by the courts in interpreting valuation questions ... and have been accorded `great weight' in this regard." (Prudential Ins. Co. v. City and County of San Francisco (1987) 191 Cal.App.3d 1142, 1155, 236 Cal.Rptr. 869.)
[13] The Attorney General recognized as much in its opinion: "In any event, it should be noted that even if the restrictions contained in the regulatory agreements entered into by the federal government and the 236 project owners did not constitute enforceable use restrictions within the meaning of section 402.1, the assessor would nevertheless be required to consider their effect upon the value of the 236 project under the constitutional mandate that property be assessed at a percentage of its fair market value." (59 Cal.Ops.Atty.Gen., supra, p. 295.)
[14] Appellant argues that section 402.1 only applies to fair market valuations which utilize a comparable sales approach. Whatever the merit of appellant's contention, it does not change the fact that enforceable restrictions must be considered in calculating fair market value under section 110 and in calculating fair market value using, the income approach, as set forth in Property Tax Rule 8.