[No. A118806. First Dist., Div. Five. June 11, 2009.]

JPMORGAN CHASE BANK, N.A., as Trustee, etc., Plaintiff and Appellant, v. CITY AND COUNTY OF SAN FRANCISCO et al., Defendants and Respondents.

## COUNSEL

Fulbright & Jaworski, Robert W. Fischer and Spencer Persson for Plaintiff and Appellant.

Dennis J. Herrera, City Attorney, Julie Van Nostern, Chief Tax Attorney, James M. Emery, Peter J. Keith and Michael Slatter, Deputy City Attorneys, for Defendants and Respondents.

## OPINION

**NEEDHAM, J.**—Revenue and Taxation Code section 5097[1] provides that a taxpayer seeking a refund of property taxes must file a verified claim within

---

[1] Further statutory references are to the Revenue and Taxation Code unless otherwise indicated.

four years after making the payment of the disputed tax unless an alternative period triggered by circumstances not relevant here applies. Appellant JPMorgan Chase Bank, N.A., as Trustee for the IBM Personal Pension Plan (Chase), filed a civil suit seeking a refund of fraud penalties imposed pursuant to earlier versions of sections 503 and 504 without filing a timely claim under section 5097. We conclude the failure to file a timely claim bars this action. We affirm the superior court judgment entered against Chase on its complaint.

## I. FACTS AND PROCEDURAL HISTORY

### A. One Market Plaza and the Separate Account Annuity Contracts

In 1973, the One Market Plaza Joint Venture (Joint Venture) was formed as a general partnership between The Equitable Life Assurance Society of the United States (Equitable), a New York corporation, and Southern Pacific Land Company (Southern Pacific), a California corporation. Equitable had a 90 percent interest in the Joint Venture and Southern Pacific had a 10 percent interest. Subsequently, the Joint Venture built One Market Plaza in downtown San Francisco, consisting of two large office towers on one lot (parcel No. 3713-007) and a parking garage on a second lot (parcel No. 3741-031).

The IBM Personal Pension Plan (the Plan) is an employee benefit plan established by International Business Machines Corporation (IBM) for the benefit of IBM's former employees.[2] Chase Manhattan Bank, N.A., the predecessor in interest to appellant JPMorgan Chase Bank, N.A. (collectively, Chase), was the Plan's trustee. Equitable acted as the Plan's investment advisor. The Plan approached Equitable about developing proposals for investments in office buildings.

In December 1986, Equitable and the Plan entered into an annuity contract under which the Plan acquired 90 percent of Equitable's 90 percent interest in the Joint Venture (81 percent of the whole), which was placed into separate account No. 143, established and maintained by Equitable on behalf of the Plan. In exchange, the Plan paid Equitable an amount representing 81 percent of the subject property's fair market value. Chase was a party to this transaction as trustee for the Plan.

The formation of such separate accounts are highly regulated transactions authorized by the insurance laws of California and New York, through which insurance companies sell annuities backed by assets placed into separate

---

[2] The Plan is governed by the Employee Retirement Income Security Act of 1974 (ERISA). (29 U.S.C. § 1001 et seq.)

accounts, segregated from the insurance company's general assets and, therefore, beyond the reach of the company's general creditors. The insurance laws of California and New York treat assets placed in the separate account of an insurance company as legally remaining the property of the insurer (here, Equitable), not the beneficiary (here, the Plan). (See Ins. Code, § 10506, subd. (a); N.Y. Ins. Law § 4240, subd. (a)(12).)

As a result of the 1986 separate account transaction, Equitable retained legal title to the property while the beneficial interest transferred to the Plan. The Plan bore the risks and benefits of ownership of its share of the property. Income from rents on the Plan's share of the property were paid to the Plan through the separate account. The Plan had the power to hire the day-to-day manager for the property and to demand that Equitable transfer its remaining interest in the property to the Plan.

As a result of subsequent transactions, Equitable continued to hold a nominal 99.5 percent interest in the Joint Venture, with a 90 percent interest allocated to separate account No. 143 on behalf of the Plan. In March 1990, Equitable and the Plan entered into a second annuity contract and created separate account No. 178, into which Equitable reallocated all of its interest in the Joint Venture from separate account No. 143. Chase was a party to this transaction as the trustee for the Plan. At this point, the property was still owned by the Joint Venture, which was itself owned 99.5 percent by Equitable on the Plan's behalf. In June 1990, the remaining 0.5 percent of the Joint Venture was sold by Equitable's wholly owned subsidiary to the Plan's wholly owned subsidiary, One Market Plaza.

Equitable notified its property insurer to terminate coverage of the subject property effective March 30, 1990, because as of that date Equitable would no longer have an ownership interest in the property. In November 1990, the Plan replaced Equitable's property manager with its own. Thereafter, Equitable had no management responsibility for the property.

In 1994, the subject property was sold to an unrelated third party. In November 1994, Equitable, IBM, and Chase, as trustee for the Plan, executed a release and indemnification agreement providing that upon completion of the sale of One Market Plaza, the separate account and the Joint Venture were dissolved. The Plan was given all rights and liabilities arising from any tax reassessments and all rights to recover any overpayment of taxes and penalties.

B. *Property Tax Reassessment and Penalties*

The transfer of ownership of California real estate triggers a reassessment of the property under article XIII A of the California Constitution (Prop. 13)

and a recalculation of the property taxes due. Following an investigation of the ownership of the property, the Assessor for the City and County of San Francisco (Assessor) concluded that the 1986 separate account transaction constituted a change of ownership under the Revenue and Taxation Code.[3] The Assessor concluded that, as a result of the 1986 transaction, Equitable transferred to the Plan all rights of ownership, including the right to manage, receive rent from and sell the subject property.

The Assessor gave notice to Equitable, as the owner of record, of a series of supplemental and escape assessments on the property for the 1986 through 1992 tax roll years. In March 1992, a notice was sent calculating the new property values based on a determination that 81 percent of the property could be reassessed (i.e., the percentage interest in the Joint Venture that was placed in separate account No. 143 as of 1986). In April 1993, a notice of reappraised values was sent to Equitable after the Assessor determined that 100 percent of the property, not merely the 81 percent subject to the separate account, could be reassessed. Including a retroactive transfer tax bill, the amount owed to the Assessor was about $17 million. The Joint Venture paid the amount owed.

In August 1994, the Assessor notified Equitable that the assessed values for the 1986 through 1994 tax years would once again be increased. In November 1994, Equitable was given notice that fraud penalties of 25 percent would be imposed for the 1986 through 1992 tax years, pursuant to previous versions of sections 503 and 504. These new assessments and penalties totaled approximately $18 million, and were paid to respondent the City and County of San Francisco (City) by Chase in 1995. Thus, the total amount of increased property taxes and penalties resulting from the reassessments was about $35.5 million, of which Chase paid approximately $18 million.

## C. *Equitable/Joint Venture's Application to the AAB*

Between 1992 and 1994, Equitable and the Joint Venture filed requests for reassessment with the Assessment Appeals Board for the City and County of San Francisco (AAB), challenging the Assessor's valuation of One Market Plaza for tax years 1986 through 1994 and the fraud penalties imposed for tax years 1986 through 1992. The applications included requests for refunds under section 5097. The Plan appeared in the proceedings before the AAB,

---

[3] Revenue and Taxation Code section 60 defines a " 'change in ownership' " as "a transfer of a present interest in real property, including the beneficial use thereof, the value of which is substantially equal to the value of the fee interest." Acquisition of more than a 50 percent interest in a joint venture results in a change in ownership of all property held by the joint venture. (§ 64; *Crow Winthrop Operating Partnership v. County of Orange* (1992) 10 Cal.App.4th 1848, 1856, fn. 6 [13 Cal.Rptr.2d 696].)

representing itself as the sole remaining partner in One Market Plaza, a joint venture. It does not appear that Plan ever filed a request for reassessment or application for refund on its own behalf.

In August 2001, following a lengthy hearing, the AAB issued its findings of fact and conclusions of law in which it (1) determined that the 1986 separate account transaction consisted of an assessable change in ownership because it transferred a majority of the beneficial interest of One Market Plaza from Equitable to the Plan; (2) determined the appropriate valuations of One Market Plaza for the tax years at issue; and (3) upheld the fraud penalties imposed by the Assessor, finding that "cumulatively, the evidence demonstrates a pattern of misrepresentation, knowledge and intent to defeat the Revenue and Taxation Code." Because the valuations submitted by the Assessor and accepted by the AAB were less than those initially used by the Assessor to calculate the escape and supplemental assessments, a partial refund of approximately $12.6 million was due the taxpayer.

On March 8, 2002, in response to requests by the parties, the AAB issued a clarification of its prior order. Among other things, the clarification order specified that only the office tower parcel (parcel No. 3713-007) was subject to the reassessments and fraud penalties for the years 1986 through 1992. No application had been filed with respect to the garage parcel (parcel No. 3741-031) for those years, and while the 1993 to 1994 assessments affected the garage parcel as well, fraud penalties were not at issue during those years. As a result of the exclusion of the garage parcel from the calculation of the reassessments from 1986 through 1992 and from the calculation of fraud penalties for all years in dispute, a further refund of over $2 million (in addition to the $12.6 million already calculated) was due. In April 2002, the City's controller wired approximately $12.6 million to Chase on behalf of the Plan "for settlement of [the] AAB [August 2001] decision." It did not send Chase (and apparently has not sent any party) the additional refund for the garage parcel that was the subject of the March 8 clarification order.

### D. *Federal Lawsuit by Chase*

Meanwhile, in 1995, Chase filed an action in federal district court seeking a declaratory judgment that the Assessor's change of ownership determination on the One Market Plaza property was preempted by ERISA. (See *Chase Manhattan Bank, N.A. v. San Francisco* (9th Cir. 1997) 121 F.3d 557, 558 (*Chase Manhattan v. San Francisco*).) The district court dismissed the case after finding that it lacked subject matter jurisdiction under 28 United States Code section 1341, which provides that " 'district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State

law where a plain, speedy and efficient remedy may be had in the courts of such State.' " (*Chase Manhattan v. San Francisco*, at p. 558.) In a decision filed August 18, 1997, the Ninth Circuit Court of Appeals upheld the dismissal, concluding that Chase had failed to demonstrate the ERISA issue could not be raised in state court as a defense. (121 F.3d at p. 560.)

### E. *Lawsuit for Refund by the Plan*

In February 2002 (before the AAB issued its Mar. 8, 2002 clarification order), the Plan filed a verified complaint in the San Francisco Superior Court against the City and the AAB. Although it initially challenged the AAB's conclusion that the 1986 separate account transaction was a change in ownership, ultimately, the Plan narrowed the relief sought to a full refund of the fraud penalties imposed, or in the alternative, to a partial refund of the fraud penalties imposed on the garage site based on the clarification order. The Plan's lawsuit was consolidated with a petition for writ of administrative mandamus filed by the Assessor against the AAB and the City seeking to set aside the March 8, 2002 clarification order on the ground that the AAB lacked jurisdiction to modify the substance of its August 2001 decision. (Code Civ. Proc., § 1094.5.)

The trial court upheld the AAB's tax fraud ruling in its entirety, determining, among other issues, that the Plan had standing to bring its refund action and that the AAB had jurisdiction to issue its clarification order, which had eliminated the fraud penalty assessments for tax years 1986 through 1992 for the garage parcel of the subject property. The superior court entered judgment of $2,053,510 plus interest in favor of the Plan, apparently reflecting the amount of the refund on the garage parcel pursuant to the March 8, 2002 clarification order. The court entered judgment against the Plan on its claim for a refund of the other fraud penalties paid.

Both parties appealed. In a published decision filed August 15, 2005, this court concluded that the Plan lacked standing to pursue a refund of taxes and fraud penalties because section 5140 allows a refund action only by the "person who paid the tax . . . ." and the Plan had not proven that it paid the taxes and penalties for which a refund was sought. (See *IBM Personal Pension Plan v. City and County of San Francisco* (2005) 131 Cal.App.4th 1291, 1294 [32 Cal.Rptr.3d 656] (*IBM Personal Pension Plan*).) "[T]he administrative record shows that Chase, not the Plan, paid the tax and penalties. . . . In early 1995, IBM authorized Chase to wire approximately $18.4 million from a particular 'IBM Transfer Account' to the Bank of America for payment of the additional property taxes and penalty assessed on the subject property. The record does not reveal whether the 'IBM Transfer Account' contained funds belonging to the Plan or IBM." (*Id.* at p. 1303.) The decision reversed that

portion of the judgment awarding the Plan a partial refund in the amount of $2,053,510 and affirmed the judgment in favor of the City on the Plan's claim for refund of additional fraud penalties. (*Id.* at p. 1306.)

F. *The Instant Lawsuit by Chase*

Following this court's decision reversing the $2,053,510 judgment in favor of the Plan, Chase filed a claim for a refund with the San Francisco Board of Supervisors on October 28, 2005, to which no response was ever received. On December 23, 2005, Chase filed the current civil action against the City and the AAB, asserting its entitlement to two distinct sums of money: (1) the fraud penalties that were imposed by the Assessor in November 1994 and paid by Chase in 1995; and (2) the $2,053,510 refund of taxes and penalties on the garage parcel, based on the AAB's March 8, 2002 clarification order. The complaint included causes of action for a refund of taxes based on penalty assessments, a refund of taxes based on the AAB's clarification order of March 8, 2002, administrative mandamus requiring the City to refund the tax penalties found owing under the March 8 clarification order, administrative mandamus requiring the AAB to hold new hearings and a constructive trust imposed on the City for the amount due under the clarification order.

Following a bench trial, the superior court issued findings of fact and conclusions of law rejecting Chase's claims and entered judgment in favor of the City and the AAB. The court found that Chase had failed to file a timely refund claim, had failed to exhaust its administrative remedies and had failed to demonstrate that it was the party that paid the $2,053,510 in taxes and penalties refunded in the March 8, 2002 clarification order. It alternatively concluded that the AAB properly applied a preponderance of the evidence standard to the fraud penalties, and that the resulting determination of fraud was supported by substantial evidence. Chase appeals from this judgment, arguing that its lawsuit is not barred under section 5097, that Chase is entitled to a judgment of mandamus compelling the City to pay it the money owed under the March 8, 2002 clarification order, that the fraud penalties were imposed based on the wrong legal standard and were not supported by the evidence, and that Chase was denied due process when the AAB subpoenaed evidence to support the fraud penalties.

## II. *DISCUSSION*

The City and the AAB argue that Chase may not pursue this action to challenge the fraud penalties imposed by the Assessor because it failed to file a timely claim for a tax refund. We agree.

Section 5097 provides in relevant part, "(a) No order for a refund under this article shall be made, except on a claim: [¶] (1) Verified by the

person who paid the tax, his or her guardian, executor, or administrator. [¶] (2) . . . [*F*]*iled within four years after making the payment sought to be refunded* . . . ." (Italics added.)[4] The timely filing of a refund claim is a statutory prerequisite to a refund action: "No action shall be commenced or maintained under this article . . . unless a claim for refund has first been filed pursuant to Article 1 (commencing with Section 5096)." (§ 5142, subd. (a).)[5] Failure to file a refund claim within the four-year period deprives a court of jurisdiction to consider the issue. (*Plaza Hollister Ltd. Partnership v. County of San Benito* (1999) 72 Cal.App.4th 1, 35 [84 Cal.Rptr.2d 715] (*Plaza Hollister*); see also *Mission Housing Development Co. v. City and County of San Francisco* (1997) 59 Cal.App.4th 55, 65–66 [69 Cal.Rptr.2d 185] [failure to file refund claim within four-year period rendered lawsuit untimely].) Chase did not file a claim for a refund until October 2005, more than 10 years after it paid the taxes and penalties it now seeks to recover.

 Chase argues that its filing of a complaint in the federal district court on January 3, 1995, was tantamount to a refund claim under section 5097. We disagree. The federal action sought a declaratory judgment stating that ERISA preempted the Assessor's determination that a change of ownership occurred with respect to One Market Plaza in 1986. (*Chase Manhattan v. San Francisco, supra,* 121 F.3d at p. 558.) It did not seek a refund of any tax payment; to the contrary, Chase had not yet made any payment when the complaint was filed. (See *Sea World, Inc. v. County of San Diego* (1994) 27 Cal.App.4th 1390, 1407 [33 Cal.Rptr.2d 194] [§ 5097, subd. (a) requires that a refund claim be made " 'after [the] making of the payment' " and a claim filed before the payment of the disputed taxes is "inherently flawed as untimely"].) Significantly, Chase maintained in the federal action that it was *not* the taxpayer under state law (*Chase Manhattan v. San Francisco,* at p. 559), a position that would not have given any party notice that it was seeking a refund when, under state law, a refund may only be sought by the taxpayer. The filing of the federal lawsuit did not fulfill Chase's duty to file a timely refund claim.

---

[4] Section 5097 sets forth alternative time periods for filing a refund claim that are applicable under circumstances not presented here. Effective January 1, 2009, the statute was amended to alter some of those time periods and to additionally allow for the filing of a refund claim within 60 days of the date that notice is given of a correction of the assessment amount under newly amended section 4836. (Stats. 2008, ch. 329, § 1.) The parties do not assert that any period other than the four-year period of section 5097, subdivision (a)(2) has any bearing on this case, nor do they assert that the recent amendment to section 5097 affects this litigation. Section 4(b) of the bill amending section 5097 specifically provides, "Nothing in the legislative history of the amendments made by this act shall be construed as any indication of the meaning of the law as it existed prior to the effective date of the amendments made by this act." (Stats. 2008, ch. 329.)

[5] These statutory requirements apply to applications to recover penalties, interest and costs, as well as the taxes themselves. (§ 5107; see *IBM Personal Pension Plan, supra,* 131 Cal.App.4th at pp. 1300–1301.)

Taking another approach, Chase urges us to conclude that its action for a refund is timely under Code of Civil Procedure section 355, which provides, "If an action is commenced within the time prescribed therefor, and a judgment therein for the plaintiff be reversed on appeal other than on the merits, a new action may be commenced within one year after the reversal." Chase submits that the Plan's lawsuit against the City and the AAB was timely filed in February 2002, and that its own lawsuit was timely because it was filed within one year of this court's opinion reversing the $2,053,510 judgment in the Plan's favor based on its lack of standing. We disagree. Section 355 applies to a second lawsuit by *the plaintiff*; in this case, Chase was not the plaintiff in the first lawsuit.

Chase argues that it pursued the necessary administrative remedies before filing this action because it "adequately participated" in the hearings before the AAB on the applications filed by Equitable and the Joint Venture. Again we disagree. Although the Plan appeared in the AAB proceedings, Chase did not. "Because article XIII, section 32 [of the California Constitution] vests the Legislature with plenary control over the manner in which tax refunds may be obtained, a party 'must show strict, rather than substantial, compliance with the administrative procedures established by the Legislature [Citation].' " (*IBM Personal Pension Plan, supra*, 131 Cal.App.4th at p. 1299.) And to the extent that Chase is suggesting the Plan's appearance before the AAB was an adequate substitute for its own, it makes no showing that the Plan submitted a timely, valid claim for a refund under section 5097.

Chase argues that it was not required to file a timely refund claim under section 5097 because under *CAT Partnership v. County of Santa Cruz* (1998) 63 Cal.App.4th 1071 [74 Cal.Rptr.2d 652] (*CAT Partnership*), one party may rely on a related party's appearance before an assessment appeals board to satisfy the exhaustion of remedies requirement. We are not persuaded.

In *CAT Partnership*, three related companies had an ownership interest in a cable system servicing the Santa Cruz area: CAT Partnership acquired the system in 1987, Tele-Communications, Inc. (TCI), was one of the three partners in CAT, and UACC Midwest, Inc. (UACC), was a subsidiary of TCI that later assumed ownership of the cable system from CAT. (*CAT Partnership, supra*, 63 Cal.App.4th at pp. 1076–1077.) CAT and UACC appealed the county tax assessor's valuation of the possessory interest in the cable system, but TCI did not. (*Id.* at p. 1077.) All three entities then filed claims for tax refunds against the county under section 5097, and, when those claims were denied, filed tax refund actions in superior court. (*CAT Partnership*, at p. 1078.) The trial court entered a judgment that set aside a portion of the challenged assessment and awarded a refund to TCI, the entity

it determined to be the actual taxpayer. (*Id.* at pp. 1078–1079 & fn. 8.) On appeal, the court rejected the county's argument that TCI had failed to exhaust its administrative remedies because it was not an applicant in the Santa Cruz assessment appeals board proceedings. (*Id.* at pp. 1079–1081.) It reasoned that while TCI was not a formal litigant before the assessment appeals board, it was a partner of one participant, a successor in interest to another, and its claims had been fully litigated. (*Id.* at pp. 1080–1081.)

■ Though Chase attempts to analogize its relationship with the Plan to those of the parties in *CAT Partnership*, there is a critical difference between that case and the one before us: all three parties in *CAT Partnership* filed claims for refunds under section 5097. (*CAT Partnership, supra*, 63 Cal.App.4th at p. 1078.) While the exhaustion of remedies requirement at issue in *CAT Partnership* is frequently described as "jurisdictional," it is "a judicially developed doctrine . . . distinct from statutorily prescribed jurisdictional prerequisites to statutory causes of action." (*Plaza Hollister, supra*, 72 Cal.App.4th at pp. 35–36.) By contrast, "In regards to a tax refund action under section 5141 et seq., the Legislature has expressly and plainly prescribed the procedural prerequisite of filing a timely claim for refund [under section 5097]. We think this requirement must be viewed as a precondition to the court's exercise of jurisdiction given the unambiguous statutory language. Any other reading would be unreasonable and contravene legislative intent." (*Plaza Hollister*, at p. 35.)

Because neither Chase nor the Plan filed a timely claim under section 5097, the courts are without jurisdiction to consider Chase's refund claim; i.e., they lack the *power* to consider Chase's claims and grant relief. (*Plaza Hollister, supra*, 72 Cal.App.4th at p. 36.) We will not engraft onto this statutory scheme exceptions borrowed from the judicially fashioned doctrine of exhaustion of administrative remedies. (See *Shiseido Cosmetics (America) Ltd. v. Franchise Tax Board* (1991) 235 Cal.App.3d 478, 488–489 [286 Cal.Rptr. 690] (*Shiseido*) [exhaustion of remedies doctrine has no application to an action to recover a tax paid; courts are without authority to alter statutory procedures for tax refunds enacted by the Legislature].)

Chase is not assisted by the decision in *Focus Cable of Oakland, Inc. v. County of Alameda* (1985) 173 Cal.App.3d 519, 525–527 [219 Cal.Rptr. 95] (*Focus Cable*), which concluded that the failure to cite a particular statute in a refund claim filed under section 5097 did not bar the trial court in a subsequent refund action from granting relief under that statute. The refund claim had described the facts giving rise to relief under the statute; it was only the code section itself that had been omitted. (*Focus Cable*, at p. 527.) It is one thing to say that a timely claim must be liberally construed and will be deemed sufficient if it states the facts underlying the challenge to the

assessment but omits a citation to the relevant code section. It would be quite another to conclude, as Chase would have us do, that the policy of liberally construing a refund claim allows us to excuse a party's failure to file any claim at all.

■ Nor are we persuaded by Chase's claim that the four-year period of section 5097, subdivision (a) was extended through the doctrine of equitable tolling. It is doubtful that state courts may apply the judicially created doctrine of equitable tolling to alter state tax refund procedures established by the Legislature pursuant to its constitutional grant of power. (*Patane v. Kiddoo* (1985) 167 Cal.App.3d 1207, 1214 [214 Cal.Rptr. 9] [in action to recover unemployment insurance taxes, court refused to extend judge-made futility exception to requirement that taxpayer exhaust administrative remedies]; see also *United States v. Brockamp* (1997) 519 U.S. 347, 352 [136 L.Ed.2d 818, 117 S.Ct. 849] (*Brockamp*) [equitable tolling unavailable to extend time for filing federal income tax refund claim].) " '[S]trict legislative control over the manner in which tax refunds may be sought is necessary so that governmental entities may engage in fiscal planning based on expected tax revenues.' " (*IBM Personal Pension Plan, supra*, 131 Cal.App.4th at p. 1299.)

"Ordinarily limitations statutes use fairly simple language, which one can often plausibly read as containing an implied 'equitable tolling' exception" (*Brockamp, supra*, 519 U.S. at p. 350), but "[e]quitable tolling is not permissible where it is inconsistent with the text of the relevant statute" (*United States v. Beggerly* (1998) 524 U.S. 38, 48 [141 L.Ed.2d 32, 118 S.Ct. 1862]). In *Lantzy v. Centex Homes* (2003) 31 Cal.4th 363, 371 [2 Cal.Rptr.3d 655, 73 P.3d 517], our state Supreme Court rejected the plaintiff's argument that equitable tolling could extend the limitations period for suits based on latent construction defects under Code of Civil Procedure section 337.15, subdivision (a), which provides, "*No action may be brought . . .* more than 10 years after the substantial completion of the development or improvement . . . ." (Italics added.) The court concluded that this "stentorian" language, combined with the statute's inclusion of several express exemptions to the limitations period and its stated purpose of protecting contractors from perpetual exposure to lawsuits, demonstrated that equitable tolling would not extend the limitations period for reasons not stated in the statute itself. (*Lantzy, supra*, at pp. 373–374.) Similarly, section 5097, subdivision (a) provides, "No order for a refund under this article shall be made . . ." except upon the timely filing of a refund claim, and section 5142, subdivision (a) provides, "No action shall be commenced . . ." unless a claim for refund has been filed pursuant to section 5097. This language, similar to that in the statute considered in *Lantzy*, signifies an intent to restrict the doctrine of equitable tolling, which is consistent with the Legislature's plenary control over tax

refunds and the necessity of strict compliance with the administrative refund procedures. (See *IBM Personal Pension Plan, supra,* 131 Cal.App.4th at p. 1299.)

Chase asserts that notwithstanding its failure to file a claim for refund within four years of the payments it made in 1995, it was entitled to judgment in its favor with respect to the $2,053,510 refund on the garage parcel that was owed under the AAB's March 8, 2002 clarification order. On its face, section 5097 applies no less to the refund ordered by the AAB on the garage parcel than it does to the refund sought for the fraud penalties in general. All monies paid by Chase were paid in 1995, and it failed to file a claim "within four years after making the payment sought to be refunded . . . ." (§ 5097, subd. (a)(2).)

■ Chase cannot avoid the procedural bar of section 5097 through its cause of action seeking a writ of administrative mandamus directing payment of the $2,053,510 refund on the garage parcel. "Where the procedure for testing the validity of the assessment and the tax levied pursuant thereto is applicable, through a payment under protest and suit for refund, there is no right to employ administrative mandamus . . . ." (*County of Sacramento v. Assessment Appeals Bd. No. 2* (1973) 32 Cal.App.3d 654, 672 [108 Cal.Rptr. 434].) ■ In any event, the statutory deadline for filing a mandamus action in superior court is 90 days from the date of the administrative decision of which review is sought. (Code Civ. Proc., § 1094.6; see also *Volkswagen of America, Inc. v. Superior Court* (2001) 94 Cal.App.4th 695, 701 [114 Cal.Rptr.2d 541] [where no statutory deadline for filing a writ applies, courts usually impose deadline of 60 days].) This action was filed more than three and a half years after the AAB's March 8, 2002 clarification order.

Finally, we are unpersuaded by Chase's reliance upon a line of cases standing for the proposition that when a tax refund is sought based on a void assessment that should never have been made in the first place, as opposed to a dispute over the valuation of the property, the taxpayer may file a lawsuit without first seeking relief from the board of equalization. (*Tele-Vue Systems, Inc. v. County of Contra Costa* (1972) 25 Cal.App.3d 340 [101 Cal.Rptr. 789] [no remand to equalization board necessary in lawsuit for refund based on nonownership of cable television equipment]; *Pacific Grove-Asilomar Operating Corp. v. County of Monterey* (1974) 43 Cal.App.3d 675 [117 Cal.Rptr. 874] [superior court should hold a trial de novo on the issue of void assessment and is not limited to a review of the administrative record presented to the assessment board]; *Parr-Richmond Industrial Corp. v. Boyd* (1954) 43 Cal.2d 157 [272 P.2d 16] [refund claim based on theory that taxpayer did not own the property assessed was properly presented to court

without first seeking administrative remedies].) Chase suggests that because the issues in this case are not, strictly speaking, matters of valuation, it was not required to seek relief before the AAB and cannot be faulted for having brought this suit without filing a claim or exhausting its administrative remedies.

None of the cases cited by Chase addresses the failure to file a claim under section 5097. All of them precede the enactment of section 5142, the current statute making a claim under section 5097 a prerequisite to filing a lawsuit seeking a refund. Since 1993, section 5142, subdivision (b) has allowed the person affected and the assessor to stipulate that a claim involves only nonvaluation issues and, if that stipulation is accepted by the assessment appeals board, it may be deemed an exhaustion of administrative remedies for a reduction of an assessment. (See Stats. 1993, ch. 387, § 8, p. 2218.) But the statute also provides that "the filing of, and the acceptance by the board of, a stipulation under this subdivision *shall not excuse or waive the requirement of a timely filing of a claim for refund.*" (§ 5142, subd. (b); Stats. 1993, ch. 387, § 8, p. 2218, italics added.) While the predecessor statute to section 5142 made a refund claim a prerequisite to a lawsuit, it did not contain such specific language. (See former § 5104, added by Stats. 1941, ch. 664, § 9, p. 2115 and repealed by Stats. 1976, ch. 499, § 7, p. 1240 ["No action shall be commenced or maintained under this article unless a claim for refund shall have been filed in compliance with the provisions of this article, and no recovery of taxes shall be allowed in any such action upon a ground not asserted in the claim for refund."].)

■ Chase has cited no authorities that would permit us to ignore the clear language of section 5097 and its requirement of a timely refund claim. Because that statute is "jurisdictional" in the purest sense of that word, it deprives us of the power to consider Chase's challenge to the AAB rulings. (See *Plaza Hollister, supra,* 72 Cal.App.4th at pp. 34–36; *Shiseido, supra,* 235 Cal.App.3d at pp. 488–489.) The trial court properly entered judgment against Chase on its claims. Our conclusion on this issue makes it unnecessary to consider Chase's remaining arguments concerning the standard of proof applicable to fraud penalties and the sufficiency of the evidence supporting the penalties imposed in this case.

## III. *DISPOSITION*

The judgment is affirmed. Respondents are entitled to costs on appeal.

Jones, P. J., and Simons, J., concurred.