Filed 12/7/20; See dissenting opinion

# CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
### SECOND APPELLATE DISTRICT
### DIVISION FIVE

| | |
|---|---|
| JEFFREY PRANG, Los Angeles County Assessor, <br><br>     Plaintiff and Respondent <br><br> v. <br><br> LUIS A. AMEN et al., as Trustees, etc., <br><br>     Real Party in Interest and Appellant, | B298794 <br><br> (Los Angeles County Super. Ct. No. BS173698) |

    APPEAL from a judgment of the Superior Court of Los Angeles County, James C. Chalfant, Judge. Affirmed.

    Greenberg Traurig, Colin W. Fraser and Cris O'Neal for Real Party in Interest and Appellant.

    Lamb and Kawakami, Thomas G. Kelsh and Michael K. Slattery; Mary C. Wickham, County Counsel, Nicole Davis Tinkham, Assistant County Counsel, and Richard Girgado, Deputy County Counsel for Petitioner and Respondent.

    Ajalat, Polley, Ayoob & Matarese, Richard J. Ayoob, Christopher J. Matarese and Gregory R. Broege for Amicus

Curiae Ajalat, Polley, Ayoob & Matarese.

California State Association of Counties and Jennifer B. Henning for Amicus Curiae California State Association of Counties and the California Assessors Association.

McDermott Will & Emery and Charles J. Moll, III, for Amicus Curiae Charles J. Moll III.

Xavier Becerra, Attorney General, Tamar Pachter, Assistant Attorney General, Karen W. Yiu and Heather B. Hoesterey, Deputy Attorneys General, for Amicus Curiae California State Board of Equalization.

———————————————

The Revenue and Taxation Code provides that a transfer of real property between legal entities triggers a reassessment of the property's value for tax purposes.  Importantly for this appeal, the code also contains an exception to this rule when the proportional ownership interests in real property of the transferor and transferee—"whether represented by stock" or another measure—remain the same after the transfer.  This appeal raises the question of how we should interpret "stock" in the phrase "proportional ownership interests of the transferors and transferees, whether represented by stock, partnership interest, or otherwise, in each and every piece of real property transferred."  (Rev. & Tax. Code, § 62, subd. (a)(2).)  Specifically, does "stock" refer only to voting stock or all classes of stock?

Appellants, the trustees of the Amen Family 1990 Revocable Trust (Trust or Appellant), challenges respondent Los

2

Angeles County Assessor's (Assessor) reassessment of property the Trust received from a corporation that the Trust had partially owned.[1]  Although there were at least five owners of the stock of the transferor corporation (including the Trust) and the transferee was solely the Trust, the Trust contends the proportional ownership interest exception applied because it had owned all the voting stock in the corporation.  In the Trust's view, ownership interests in real property held by a corporation should be measured by voting stock alone, meaning that the Trust was the sole owner of the real property held by the corporation, and remained the sole owner after the corporation transferred that property to the Trust.  The Assessor measured ownership in the real property held by the transferor corporation by all stock—voting and non-voting.

According to the Trust, the term "stock" as used in Revenue & Taxation Code section 62, subdivision (a)(2) (section 62(a)(2)) should be interpreted to mean only voting stock.[2]  The Assessor argues "stock" in section 62(a)(2) means exactly what it says—stock—and applies to all classes of stock, including for present purposes both voting and non-voting stock.  Under this interpretation, the Assessor was right to reassess the property after the transfer because the proportional ownership interests,

---

[1]      The State Board of Equalization (SBE) and others filed amicus curiae briefs at our invitation.  Under California Rules of Court, rule 8.20(c)(6) we provided the parties with an opportunity to respond to the amicus arguments and each filed a supplemental brief.

[2]      All further statutory references are to the Revenue and Taxation Code.

3

as measured by all the stock of the transferor corporation, had changed.

The trial court agreed with the Assessor and upheld the reassessment. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Super A Foods, Inc. (the "Corporation") held title to two pieces of real property (the "Property") in Los Angeles. All of the Corporation's voting stock was issued to the Trust. The Corporation's non-voting stock was issued to the Trust and several other individuals, including a company employee.

On December 5, 2014, the Corporation transferred the Property to the Trust whose beneficiaries did not include the persons who had non-voting stock in the Corporation. The Assessor determined the transfer constituted a change of ownership from the Corporation to a separate entity, the Trust, and reassessed the Property from approximately $5 million to $10 million. The Trust appealed the Assessor's change-of-ownership determination to the Assessment Appeals Board (Board).

The Board reversed the reassessment, concluding that no change in ownership occurred when the Corporation transferred the Property to the Trust. The Board reasoned that only voting stock should be considered when analyzing whether the proportional ownership interest exclusion applies under section 62(a)(2). As the Trust owned 100 percent of the voting stock of the transferor Corporation and the transferee was the Trust itself, the Board found that the transfer was excluded from reassessment under section 62(a)(2).

The Assessor filed a petition for writ of administrative mandate in the trial court and sought to vacate the Board's decision. The Assessor argued that principles of statutory

4

construction require that section 62(a)(2) be interpreted to measure ownership interest using both an entity's voting and non-voting stock. The trial court agreed and granted the petition. The Trust timely appealed.

## DISCUSSION

### 1. Standard of Review and Statutory Interpretation Principles

On appeal of a trial court's ruling on a petition for writ of administrative mandate, we review de novo issues of statutory interpretation under Code of Civil Procedure section 1094.5. (*Anserv Ins. Servs. v. Kelso* (2000) 83 Cal.App.4th 197, 204.) The general principles that guide interpretation of a statutory scheme are well-settled. (*Rudd v. California Casualty Gen. Ins. Co.* (1990) 219 Cal.App.3d 948, 952.) "Our function is to ascertain the intent of the Legislature so as to effectuate the purpose of the law. [Citation.] To ascertain such intent, courts turn first to the words of the statute itself [citation], and seek to give the words employed by the Legislature their usual and ordinary meaning. [Citation.] When interpreting statutory language, we may neither insert language which has been omitted nor ignore language which has been inserted. [Citation.] The language must be construed in the context of the statutory framework as a whole, keeping in mind the policies and purposes of the statute [citation], and where possible the language should be read so as to conform to the spirit of the enactment. [Citation.]" (*Ibid.*)

### 2. Property Tax Reassessments

"In 1978 the voters adopted Proposition 13, which provides that until a change in ownership occurs real property may be taxed at no more than 1 percent of its 1975–1976 assessed value adjusted for inflation. When ownership changes, the property may be reassessed at its current market value." (*Pacific*

5

*Southwest Realty Co. v. County of Los Angeles* (1991) 1 Cal.4th 155, 158–159 *(Pacific Southwest Realty); 926 North Ardmore Ave., LLC v. County of Los Angeles* (2017) 3 Cal.5th 319, 326 [a "change in ownership triggers reappraisal and reassessment for property tax purposes"].)  "Because Proposition 13 did not explicate the meaning of 'change in ownership' [citations], it fell to the Legislature to define the phrase . . . ." (*Pacific Southwest Realty*, *supra,* pp. 160–161.)  The Legislature did so by codifying the change-in-ownership test in Revenue and Taxation Code section 60.  (*Id.* at p. 161.)

Section 60 defines a "change in ownership" as "a transfer of a present interest in real property, including the beneficial use thereof, the value of which is substantially equal to the value of the fee interest."  Section 62 lists various tax-exempt transfers as excluded from the definition of a change in ownership.

At issue here is section 62(a)(2) which provides that a change of ownership does not include "any transfer . . . between legal entities . . . that results solely in a change in the method of holding title to the real property and in which proportional ownership interests of the transferors and transferees, whether represented by stock, partnership interest, or otherwise, in each and every piece of real property transferred remain the same after the transfer."

3. ***Facially, the Plain Meaning of Section 62(a)(2) Proportionality is Measured by All Stock***

In challenging the trial court's ruling, the Trust argues the plain meaning of "stock" should be disregarded.  It contends "stock" in section 62(a)(2) is ambiguous and, by applying various forms of statutory construction, "stock" should be interpreted to mean only voting stock.  Construed in this fashion, the proportional ownership interests of the transferor (the

6

Corporation) and the transferee (the Trust) remained the same after the transfer of the Property. The Trust owned all the voting stock in the Corporation and, as transferee, the Trust owned the property outright. Accordingly, the Trust argues that no change of ownership occurred when the Property was transferred, and the Property should not have been reassessed.

### a. The Common Meaning of Stock

The Assessor argues that the plain meaning of "stock" as used in section 62(a)(2) includes stock of every class, not just voting stock. The parties do not dispute that the commonly accepted and ordinary meaning of the term "stock" includes both voting and non-voting stock.[3]

### b. The Trust's Ambiguity Argument

In arguing that "stock" in section 62(a)(2) is ambiguous, the Trust relies on the principle that clear statutory language may be "rendered ambiguous when the language is read in light of the statute as a whole or in light of the overall legislative scheme." (*People v. Valencia* (2017) 3 Cal.5th 347, 360.) According to the Trust, section 62(a)(2)'s use of the term "stock" is ambiguous because other provisions in the "statutory scheme" use "stock" when referring to "voting stock."

---

[3] See entry for "Stock" in Black's Law Dictionary (11th ed. 2019) [defining the term and listing various kinds of stock, including voting and non-voting stock; other examples include common stock, preferred stock, and treasury stock].

The Trust posits several arguments to support its claim that, as a matter of statutory interpretation, "stock" in section 62(a)(2) really means "voting stock." We consider each.[4]

### 1. *"Voting Stock" in the Statutory Scheme and Elsewhere in the Revenue & Taxation Code*

Principal among the Trust's various arguments is that section 64 and related sections of the Revenue & Taxation Code essentially use "stock" and "voting stock" interchangeably. So, the argument continues, "stock" in section 62(a)(2) means "voting stock." A careful reading of the code sections on which the Trust relies does not show the terms are interchangeable.

The Trust's principal focus for this argument is on two subdivisions of section 64.[5] Subdivision (b) of section 64 (section

---

[4] The trial court concluded that "stock" in section 62(a)(2) was not ambiguous but proceeded to consider the Trust's other proposed statutory interpretation, as do we.

[5] Section 64, subdivisions (a) through (c) provide in part, "(a) Except as provided in subdivision (i) of Section 61 and subdivisions (c) and (d) of this section, the purchase or transfer of ownership interests in legal entities, such as corporate stock or partnership or limited liability company interests, shall not be deemed to constitute a transfer of the real property of the legal entity. This subdivision is applicable to the purchase or transfer of ownership interests in a partnership without regard to whether it is a continuing or a dissolved partnership.

"(b) Any corporate reorganization, where all of the corporations involved are members of an affiliated group, and that qualifies as a reorganization under section 368 of the United States Internal Revenue Code and that is accepted as a nontaxable event by similar California statutes, or any transfer of real property among members of an affiliated group, or any reorganization of

8

64(b)) provides that "any transfer of real property among members of an affiliated group . . . shall not be a change of ownership." The subdivision then defines "affiliated group" as "one or more chains of corporation connected through stock

_____

farm credit institutions pursuant to the federal Farm Credit Act of 1971 (Public Law 92-181), as amended, shall not be a change of ownership. The taxpayer shall furnish proof, under penalty of perjury, to the assessor that the transfer meets the requirements of this subdivision.

"For purposes of this subdivision, 'affiliated group' means one or more chains of corporations connected through stock ownership with a common parent corporation if both of the following conditions are met:

"(1) One hundred percent of the voting stock, exclusive of any share owned by directors, of each of the corporations, except the parent corporation, is owned by one or more of the other corporations.

"(2) The common parent corporation owns, directly, 100 percent of the voting stock, exclusive of any shares owned by directors, of at least one of the other corporations.

"(c)(1) When a corporation, partnership, limited liability company, other legal entity, or any other person obtains control through direct or indirect ownership or control of more than 50 percent of the voting stock of any corporation, or obtains a majority ownership interest in any partnership, limited liability company, or other legal entity through the purchase or transfer of corporate stock, partnership, or limited liability company interest, or ownership interests in other legal entities, including any purchase or transfer of 50 percent or less of the ownership interest through which control or a majority ownership interest is obtained, the purchase or transfer of that stock or other interest shall be a change of ownership of the real property owned by the corporation, partnership, limited liability company, or other legal entity in which the controlling interest is obtained."

9

ownership with a common parent corporation if . . . (1) One hundred percent of the <u>voting stock</u> . . . is owned by one or more of the other corporations [and] (2) The common parent corporation owns, directly, 100 percent of the <u>voting stock</u> . . . ." (§ 64(b) (emphasis added).) The Trust argues that the "term 'stock' in the first sentence here means voting stock, as the two numbered sentences make clear."[6] We do not read it that way. Rather, giving these words their "usual and ordinary" meaning as we must (see *In re Alpine* (1928) 203 Cal. 731, 736–737), this sentence is explained as follows: The Legislature has used a general term (stock) to explain the basic corporate relationship with the parent (e.g. not a partnership), followed by a more specific term (voting stock) to measure which type of stock qualifies for the exclusion. (See *Marshall v. Pasadena Unified School Dist.* (2004) 119 Cal.App.4th 1241, 1254.) In this context, voting stock is one of many classes of stock and is the one class that matters under section 64. It does not follow that "stock" means "voting stock" in section 62(a)(2).

The Trust also cites to subdivision (c)(1) of section 64 (section 64(c)(1)), which provides that "When a corporation . . . obtains control through direct or indirect ownership or control of more than 50 percent of the <u>voting stock</u> of any corporation . . . the purchase or transfer of <u>that stock</u> or other interest shall be a change of ownership . . . ." (Emphasis added.) The Trust argues that "voting stock" and "stock" are used interchangeably here. We see it differently—the use of the word "that" shows that the Legislature was referring to the prior use of "voting stock" in the sentence, using "that" in a grammatically correct manner.

---

[6] By "first sentence here," we understand the Trust to mean "one or more chains of corporation connected through stock ownership with a common parent corporation."

Nor do we find the different uses of "voting stock" in other parts of the Revenue and Taxation Code to mean that "stock" in section 62(a)(2) is "voting stock." Each of the Code provisions cited by the Trust uses the specific term "voting stock," not the more general term "stock." This shows the Legislature knew how to refer to "voting stock" when defining "ownership interests," and deliberately chose a different test for section 62(a)(2) than for other types of transfers. (See § 64(c) [transfer of ownership interest in a legal entity], § 64(b) [transfer of real property among subsidiaries]; § 62.1 [transfer of mobile home park to nonprofit, stock cooperative, limited equity stock cooperative or other entity formed by tenants]; § 62.5 [transfer of floating home marina to nonprofit, stock cooperative, limited equity stock cooperative or other entity formed by tenants].

The Trust's argument would carry more weight if the Code used "stock" infrequently, but "stock" is used repeatedly in the Code.[7] That the Legislature regularly uses both "stock" and voting stock" in various parts of the Code undermines the Trust's argument that in section 62(a)(2), "stock" was only a stray misnomer of "voting stock." To adopt the Trust's argument would suggest that these terms are interchangeable throughout the Code, and would make "stock" or "voting stock" at times superfluous. (See *Wells v. One2One Learning Foundation* (2006)

---

[7]     Numerous provisions in the Code use the term "stock" (§§ 23361, 23804, 250105) while others use the term "voting stock" (§§ 62.1, 62.5, 2188.10). A search of the Code reveals that "stock" is used much more frequently than "voting stock."

11

39 Cal.4th 1164, 1207 ["interpretations which render any part of a statute superfluous are to be avoided"].)[8]

   *2.     "Voting Stock" in Property Tax Rule 462.240*

The Trust also cites Property Tax Rule 462.240, subdivision (d) to support its "stock" means "voting stock" argument.[9]  As it did with section 64, the Trust again points out the regulation uses "stock" and "voting stock" in the same sentence.  (Cal. Code Regs., tit. 18, § 462.240.)  Under this regulation, an employee benefit plan's acquisition "of the <u>stock</u> of the employer corporation pursuant to which the employee benefit plan obtains . . . more than 50 percent of the <u>voting stock</u>" (emphasis added) of the corporation is not a change in ownership.  This use of the two terms neither creates ambiguity nor proves that the words are equivalents.  As in section 64, subdivision (b), the regulation employs a general term (stock) to describe a transaction that involves stock acquisition, and then employs a different and more

---

[8]     Quite the contrary, section 23361 subdivision (a), for example, expressly distinguishes "stock" and "voting stock" in the statute's last sentence:  *"Except in paragraph (c),* 'stock' does not include nonvoting stock which is limited and preferred as to dividends."  (Emphasis added.)  Stock has one meaning in paragraphs (a) and (b) and a different one in paragraph (c).

[9]     The regulations set forth in California Code of Regulations, title 18 are referred to as "property tax rules."  (*Phillips Petroleum Co. v. County of Lake* (1993) 15 Cal.App.4th 180, 189, fn. 7; *CAT Partnership v. County of Santa Cruz* (1998) 63 Cal.App.4th 1071, 1077, fn. 4.)  The rules of this subchapter "govern assessors when assessing, county boards of equalizations and assessment appeals boards when equalizing, and the State Board of Equalization, including all divisions of the property tax department."  (Cal. Code Regs., tit. 18, § 1.)

specific term (voting stock) to measure what type of stock transaction results in a change of ownership. We reject the Trust's argument by applying one of the common statutory construction principles – the use of two different terms in a statute indicates a legislative intent to distinguish between the terms. (See *Campbell v. Zolin* (1995) 33 Cal.App.4th 489, 497 ["ordinarily, where the Legislature uses a different word or phrase in one part of a statute than it does in other sections or in a similar statute concerning a related subject, it must be presumed that the Legislature intended a different meaning."].)[10]

### c. The State Board of Equalization's Ambiguity Argument

Lastly, the Trust adopts the argument of amicus the State Board of Equalization that the term "stock" is ambiguous because there are many subcategories of stock. But the fact that there are subcategories of a general term does not show ambiguity; rather it confirms that the general term includes all the subcategories. The Code expressly identifies numerous subcategories of stock: voting stock (§ 64), non-voting stock (§ 23361), capital stock (§ 212), treasury stock (§ 24942), common stock (§ 23040.1), preferred stock (§ 23040.1), and qualified small business stock (§ 18038.4). The statutory references to these various classes of stock reaffirms our interpretation of "stock" in

---

[10] The parties and amici have directed our attention to several extrinsic sources such as the Assessor's Handbook, Letters to the Assessor, and legal opinions of the State Board of Equalization. We agree with the trial court that these materials are not particularly helpful. None of the examples cited in these materials addresses the situation in which both voting and non-voting stock are at play in determining ownership under section 62(a)(2).

13

section 62(a)(2) as meaning all classes of stock, not just voting stock. [11]

---

[11] The dissent expresses concern that our holding will open the "door to a patchwork, county-by-county system of differing assessment practices that is the opposite of what the Legislature intended." (Dis. Opn., p. 3)  To avoid that result, the dissent suggests that this court should interpret Tax and Revenue Code, section 62(a)(2) consistent with the construction given by State Board of Equalization ("Board").  The Board is charged with preparing and issuing "instructions to assessors designed to promote uniformity throughout the state and its local taxing jurisdictions in the assessment of property for the purposes of taxation." (Gov. Code, § 15606, subd. (e).)  The Board filed an amicus brief and stated that it interpreted "stock" in Tax and Revenue Code section 62(a)(2) as meaning voting stock.  The California Assessors Association, a statewide association for assessors representing each of California's 58 counties, also filed an amicus brief, taking the contrary position, namely that "stock" means all stock.  Ultimately, it is this court's task to interpret the statute.  "Courts must, in short, independently judge the text of the statute, taking into account and respecting the agency's interpretation of its meaning, of course, whether embodied in a formal rule or less formal representation.  Where the meaning and legal effect of a statute is the issue, an agency's interpretation is one among several tools available to the court. Depending on the context, it may be helpful, enlightening, even convincing.  It may sometimes be of little worth." (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7–8.)

It remains to be seen whether our holding prompts the adoption of practices that avoid the dissent's concern about patchwork interpretation of section 62(a)(2).  If not, or for other reasons, the Legislature may step in.

14

***4.*** ***The Trust's Reliance on Section 64 Is Substantively Misplaced***

Implicit in many of the Trust's arguments is that sections 62 and 64 must be read together because they cover the same subject. That assumption does not hold up. The two statutes address two different kinds of transactions: the former deals with the actual transfer of real property from one entity to another; the later deals with a change of ownership of the legal entity (a corporation) that owns real property. Because the two sections deal with different methods of changing property ownership, section 64's rules relating to control of a corporation do not fit in the proportionality exclusion under section 62(a)(2).

This point is illustrated in section 64, subdivision (c)(1). When an entity obtains control of a corporation through its "ownership or control of more than 50 percent of the voting stock of [the] corporation," (section 64(c)(1)), the new configuration of the corporation becomes a transferee owner of the corporate real property for reassessment purposes. The 50 percent demarcation apparently represents a legislative policy that, because shares of corporations are regularly traded, sales of less than 50 percent of the voting stock are legally not significant to justify reassessment.

The Trust's argument that the Legislature meant "voting stock" when it used "stock" in section 62 similar to section 64 ignores that section 62 does not address sales of corporate stock at all, but transfers of real property from one entity to another. Nothing in the record suggests that intrinsic in the nature of corporations is that voting stock must be the sole measure of transfers from a corporation to another form of ownership. Section 62(a)(2) looks at the proportional interests in real property of owners of the transferor and transferee entities, not a

15

change in stock ownership.[12] The Legislature reasonably could use stock or voting stock or other standards as its section 62(a)(2) reassessment yardstick. It chose for corporations "stock," even though, as we have seen, voting stock is used in other situations covered by the Revenue and Taxation Code.

In the present case, the proportional ownership interests were not aligned before and after transfer. Before the transfer, the corporation had at least five stockholders, namely several individuals and the Trust, all five having economic interests in the Property held by the corporation. After the transfer, the Trust owned the Property, and the individuals no longer had any ownership interest in the Property. The proportional ownership interests of the transferor and transferee were different.

5.      *The "Primary Economic Value" test in Section 60 also Supports that all Stock Is Considered in Applying Section 62(a)(2)*

Finally, the Assessor correctly observes that section 62(a)(2) must be read in light of section 60, which provides, "A 'change in ownership' means a transfer of a present interest in real property, including the beneficial use thereof, the value of which is substantially equal to the value of the fee interest."

Under section 60, there is a change in ownership of real property when there is "(1) a transfer of a present interest in real property, (2) including the beneficial use thereof, (3) the value of which is substantially equal to the value of the fee interest." (*Pacific Southwest Realty*, *supra*, 1 Cal.4th at p. 162.) As explained by the *Pacific Southwest Realty* court, the "Legislature intended to find a change in ownership when the primary

---

[12]    Section 64 does not use the "proportional ownership interests" standard.

16

economic value of the land is transferred from one person or entity to another." (*Id*. at p. 167.)

The "beneficial use" inquiry in whether or not there has been a change of ownership under section 60 asks who has an economic interest in a parcel of real estate, not the nature of the ownership interests in the entity that owns the real property. Here, the Corporation's Articles of Incorporation state, "[E]xcept with respect to all voting rights being vested exclusively in the holder of the Voting Common Shares, as herein provided, the Voting Common Stock and the Nonvoting Common Stock shall be equal in all other respects including but not limited to, dividend and liquidation rights." By express provision, at a minimum both voting and non-voting stockholders had "dividend and liquidation" rights, meaning both had economic interests in the Corporation.[13] After the transfer, non-voting stockholders had no interest in the Trust and had lost their previous economic interest in the real property. The economic value of the properties had been transferred from the non-voting stockholders to the voting stockholders, resulting in a change in ownership under section 60 and one not excluded under section 62(a)(2).

---

[13] The trial court also found that non-voting stockholders had economic interests in the Corporation. "The non-voting shareholders own between .09% and 1.7% of the [Corporation's] stock. The Assessor appraised the Property at $10,280,000. It is not inconceivable that, upon liquidation of the [Corporation], a 1/7% [*sic*] shareholder may receive a significant portion of this amount." Using the trial court's findings, the non-voting stockholders would be entitled to between $92,520 and $174,760 if the Corporation had sold the property.

17

### *DISPOSITION*

The judgment is affirmed.  Each party is to bear its own costs on appeal.

RUBIN, P. J.

I CONCUR:

MOOR, J.

Jeffrey Prang, as County Assessor, etc. v. Luis Amen, as Trustee, etc. et al.
B298794


BAKER, J., Dissenting


Resolving an issue of statewide importance, the majority opinion authorizes the Assessor in Los Angeles County to reassess real property in a manner inconsistent with the considered legal view of the State Board of Equalization (the Board)—the entity responsible for promulgating property tax assessment regulations and for instructing county assessors on correct property tax assessment methods.  (Gov. Code, § 15606, subd. (c); see also Gov. Code, § 15606, subd. (e) [directing the Board to "[p]repare and issue instructions to assessors designed to promote uniformity throughout the state and its local taxing jurisdictions in the assessment of property for the purposes of taxation"].)  As a matter of statutory interpretation and of implementing agency deference (*Steinhart v. County of Los Angeles* (2010) 47 Cal.4th 1298, 1322; *Hoechst Celanese Corp. v. Franchise Tax Bd.* (2001) 25 Cal.4th 508, 524-525; *SHC Half Moon Bay, LLC v. County of San Mateo* (2014) 226 Cal.App.4th 471, 485), the majority opinion reaches the wrong result.

In regulations interpreting related statutes (see, e.g., Rev. & Tax. Code, § 64, subd. (d); Cal. Code Regs., tit. 18, § 462.180) and in guidance issued to county assessors that discusses Revenue and Taxation Code section 62, subdivision (a)(2) (Section 62(a)(2)), the Board has interpreted the term "stock" to mean voting stock.  That interpretation should be given great weight,

and I see no good reason to deviate from it. As the Board persuasively explains in the amicus briefing this court invited, its interpretation of "stock" harmonizes Section 62(a)(2) with pertinent portions of the statutory scheme implementing Proposition 13. As the Board elaborates: "If Section 62(a)(2) means 'all stock,' the exclusion under Section 62(a)(2) would be measured under one standard—all stock—but under a different standard—voting stock—to measure when the exclusion ends under [Revenue and Taxation Code] Section 64(d)." Reading "stock" in Section 62(a)(2) to mean voting stock also avoids significant administrative difficulties because, as the Board again explains, "evaluat[ing] the proportional ownership interests of voting stock is relatively straightforward and readily ascertainable" while "[a]ssessing whether or not the 'proportional ownership interests of the transferors and transferees' remained the same [for all stock shares] would necessitate an evaluation of all the different classes and types of stock and their attendant rights, having to assign what may amount to random percentages of ownership to particular classes of stock since . . . owners of corporations have no specific right to any corporate real property."

The majority's oversimplified interpretive approach (the statute just says "stock," so that means any sort of stock) fails to harmonize the statutory scheme, and that is an analytical flaw. Analytical vulnerabilities, however, are the least of the opinion's problems; the deleterious practical consequences of today's holding are the real concern. The Legislature has stated a preference for uniformity in the administration of property tax assessment practices throughout the state—with the Board specifically charged with achieving that end. (Gov. Code, § 15606, subd. (e).) The majority nonetheless permits the Los

2

Angeles County Assessor to disregard the Board's instructions and expertise, thereby opening the door to a patchwork, county-by-county system of differing reassessment methods that is the opposite of what the Legislature intended.  Not only that, decisions about how to structure an untold number of property transactions and legal entity relationships in Los Angeles County have almost certainly been informed by the Board's longstanding guidance regarding Section 62(a)(2) and related statutes.  The majority upends these reliance interests with unpredictable and, at least in some cases, unfair consequences.

Let us therefore hope today's decision is not the last word on the meaning of Section 62(a)(2).  For now, I respectfully dissent.


BAKER, J.

3