Filed 12/16/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| 290 DIVISION (EAT), LLC,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>CITY AND COUNTY OF SAN FRANCISCO,<br><br>     Defendant and Respondent. | A162055<br><br>(City & County of San Francisco Super. Ct. No. CGC-20-584416) |

This appeal presents an issue of interpretation of a tax statute. Plaintiff and appellant 290 Division (EAT), LLC (290 Division) contends that property it purchased from defendant and respondent the City and County of San Francisco (City) should have been reassessed for no more than the price it paid for the property. 290 Division paid $53 million, a price discounted to reflect a temporary below market leaseback it entered with the City. .

The City relies on case law interpreting our Constitution's requirement that property be assessed based on its fair market value to mean that a buyer's agreement to limit the use of the property does not reduce its fair market value for tax purposes. The courts have long held that while the purchase price "may play a significant role in the reassessment of property upon its sale," that price "is only the beginning and not necessarily the end of the inquiry, and that one factor that may "skew the purchase price and make it an unreliable indicator of the fair market value" is a purchase agreement containing "restrictions on the buyer's use of the property, thus resulting in a

1

reduced purchase price." (*Dennis v. County of Santa Clara* (1989) 215 Cal.App.3d 1019, 1027, 1028-1029.) The courts have held such restrictions in a purchase agreement do not bind the assessor. " 'The present owner may have invested well or poorly, may have contracted to pay very high or very low rent, and may have built expensive improvements or none at all. . . . [S]ince . . . the legislative standard of value is "full cash value," it is clear that whatever may be the rationale of the property tax, it is not the profitableness of property to its present owner.' " (*Id*. at p. 1030.) The City argues this case law, which indisputably governs properties transferred between private parties, applies to assessment of properties sold by a public entity to a private party.

290 Division relies on a statute first enacted by the Legislature in the middle of the 20th century to provide that government-imposed land use restrictions on property must be taken into account when property is valued for assessment purposes. 290 Division argues the statute should be interpreted to include among the "enforceable restrictions" that reduce the value of property for tax purposes, a leaseback agreed to as part of an arm's-length transaction between a government seller and private buyer.

We hold that "enforceable restrictions" for purposes of section 402.1 of the Revenue and Taxation Code,[1] mean land use restrictions imposed by government acting under its police power, not restrictions agreed to by a public entity selling property to a private buyer in an ordinary arm's-length transaction.

---

[1] All further statutory references are to the Revenue and Taxation Code unless otherwise specified.

2

# BACKGROUND

## I.

### *Procedural Posture*

290 Division appeals following the trial court's order sustaining the City's demurrer without leave to amend. 290 Division filed an action for refund of property taxes after it purchased two office buildings from the City that included a short-term leaseback at below-market rent. 290 Division alleged that the City's assessor failed to take the leaseback into account when valuing the buildings for property tax purposes and claims this violated section 402.1. After failing to persuade the City's Assessment Appeals Board (AAB), 290 Division sued the City in Superior Court and the City demurred to the complaint. In sustaining the City's demurrer, the trial court held that as a matter of law, the lease did not constitute an "enforceable restriction" within the meaning of section 402.1. The court further held that 290 Division failed to show a reasonable likelihood that the defect could be cured by amendment and sustained the demurrer without leave to amend.

## II.

### *Facts*

The City owned two office buildings located at 1660 and 1680 Mission Street in San Francisco (Property). The City decided to offer the Property for sale to finance the construction of a new building. The City did not include an asking price in its offer for sale.[2] As a condition of the sale, the City required that the purchaser lease the Property back to the City for a period of up to five years after the sale; three years at specified below-market rates followed by two one-year options at market rates. 290 Division submitted an

---

[2] The City did obtain an appraisal prior to the sale that valued the Property at $61,850,000 without the leaseback.

3

offer to purchase the Property for $52 million, which the City accepted. Prior to closing, 290 Division obtained a loan appraisal that valued the Property at $52 million. The appraisal took the leaseback into consideration. On May 1, 2017, the parties finalized the sale, entered into leases pursuant to the leaseback, and executed and recorded a Memorandum of Lease.

Once the change of ownership occurred on May 1, 2017, the City initially assessed the Property's new base year value at $68 million for property tax purposes. 290 Division appealed that assessment. At the hearing before the AAB, 290 Division argued that the assessor failed to consider the leaseback as an "enforceable restriction" in valuing the Property under section 402.1, subdivision (a)(2), which states that enforceable restrictions include "recorded contracts with government agencies." The City responded that the leaseback was not an enforceable restriction primarily "because the City negotiated the leaseback while acting in its proprietary capacity, rather than in its regulatory capacity."

The parties stipulated that the value of the Property was $52 million if section 402.1 did apply and $63.1 million if it did not apply. Thus, in purchasing the property for $52 million, 290 Division reaped the benefit of a discount of more than $10 million in the price in exchange for agreeing to the leaseback.

The AAB concluded that section 402.1 did not apply and found the fair market value of the Property to be $63.1 million for tax purposes. Following the AAB's decision, 290 Division filed a complaint for refund of property taxes in San Francisco Superior Court. The complaint alleged that the Property should have been valued at $52 million and that the AAB's decision was contrary to section 402.1 and not supported by precedent. The complaint sought a refund of property taxes for 2018-2019 as well as a

4

prospective refund of any taxes computed using a base year value greater than $52 million.  290 Division filed a first amended complaint after the City filed a demurrer to the complaint.[3]  The first amended complaint added allegations that the City used the proceeds from the sale of the Property to fund a new office building and that the leaseback enabled City employees to continue working at the Property in the meanwhile.  The first amended complaint further alleged that these benefits to the City from the leaseback "served the interest of public health, safety, morals and/or general public welfare."

The City demurred to the first amended complaint.  As it had in the proceedings before the AAB, the City argued that the leaseback was not an enforceable restriction under section 402.1 because the City entered the lease in its proprietary capacity.  The City argued that such a private contract was not the type of enforceable restriction contemplated under section 402.1.  As support, the City referenced other examples of "enforceable restrictions" under section 402.1, such as zoning, permits, and development controls of local governments, which are " 'designed to serve the interest of public health, safety, morals and/or general public welfare'—all  exercises of 'police power' " rather than "private commercial arrangements entered into by private parties in the open market."  It pointed to the general rule that if private parties enter into a lease and the rent is lower than what the market supports, "the property tax calculation will generally be based upon the market-supported rent, rather than the rent required under the lease." (Quoting *CAT Partnership v. County of Santa Cruz* (1998) 63 Cal.App.4th 1071, 1086 (*CAT Partnership*).)  In the transaction here, the City argued, it

_____

[3]  The City's pending demurrer to the complaint was taken off calendar after the first amended complaint was filed.

was engaged in a proprietary function, not an exercise of police power, and the below-market rent for the leaseback was not the kind of police power restriction addressed by section 402.1.

In its opposition, 290 Division argued that the language in section 402.1 was clear and unambiguous that all "recorded contracts with governmental agencies" constituted "enforceable restrictions." The Legislature did not create any exceptions for contracts with governmental agencies acting in a proprietary capacity, and 290 Division contended that the court should not rewrite section 402.1 to include one. 290 Division further argued that even if section 402.1 only applied if the City restricted use of the Property while acting in a governmental or regulatory capacity, the first amended complaint adequately alleged that the leaseback allowed City employees to continue working at the Property "and thus contribute[d] to the area's roles as a center of government activity," which served a public interest.

Following oral argument, Judge Ethan Schulman sustained the City's demurrer without leave to amend. The court rejected 290 Division's "overly literal reading of the statute" and held that the lease was not an enforceable restriction because it lacked a governmental or regulatory component. The court relied on the reasoning in *CAT Partnership, supra,* 63 Cal.App.4th 1071. The court further supported its conclusion by examining the other enumerated examples of "enforceable restrictions" under section 402.1, which involve the exercise of the government's regulatory power. Although section 402.1, subdivision (a)(11) references leases related to affordable housing, the trial court noted that the statute "makes no reference to commercial leases with government entities such as those involved here." Finally, the court held that its interpretation would avoid the anomalous

6

result in allowing different tax treatment of parties who enter into leases with a private entity and those who enter leases with the government acting in a proprietary capacity. 290 Division now appeals.

## DISCUSSION

## I.

### *Standard of Review*

We review an order sustaining a demurrer de novo and exercise our independent judgment as to whether the complaint states a cause of action as a matter of law. (*Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 125.) This extends "even as to matters not expressly ruled upon by the trial court." (*Hayter Trucking, Inc. v. Shell Western E&P, Inc.* (1993) 18 Cal.App.4th 1, 13.) We accept as true all material facts properly pled and matters which may be judicially noticed but disregard contentions, deductions or conclusions of fact or law. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.) We "give the complaint a reasonable interpretation, reading it as a whole and its parts in their context." (*Ibid.*)

"When a demurrer is sustained without leave to amend, it is the duty of the reviewing court to decide whether there is a reasonable possibility that the defect can be cured by amendment. If it can, the trial court abused its discretion and we must reverse. If it cannot be reasonably cured, there has been no abuse of discretion. [Citation.] It is the plaintiff's burden to show the reviewing court how the complaint can be amended to state a cause of action." (*Michaelian v. State Comp. Ins. Fund* (1996) 50 Cal.App.4th 1093, 1105.)

## II.

### *Whether the Valuation Method Violates Section 402.1 Is a Question of Law.*

290 Division first argues that the trial court erred in not accepting the allegations in the first amended complaint as true, including the allegation that the assessor did not follow the law in viewing the lease as an enforceable restriction and the allegation that the value of the Property was $52 million. We disagree.

Whether an assessor's method of valuation violates the law, including section 402.1, presents a question of law. (*Exxon Mobile Corp. v. County of Santa Barbara* (2001) 92 Cal.App.4th 1347, 1352 ["Contentions that go to the valuation methodology, i.e., that the Board violated valuation standards prescribed by law, present a question of law subject to de novo review"].) On the other hand, whether an assessor improperly applied a valid method of valuation presents a question of fact. (*EHP Glendale, LLC v. County of Los Angeles* (2011) 193 Cal.App.4th 262, 272.) Here, the principal allegation in the first amended complaint is that the assessor violated section 402.1 by not considering the lease as an enforceable restriction in valuing the Property. This presents an issue of law that is not admitted on demurrer but is for the court to decide.

290 Division's reliance on *People ex rel. Dept. of Conservation v. Triplett* (1996) 48 Cal.App.4th 233 (*Triplett*) is misplaced. There, the state, on behalf of the Department of Conservation and the Secretary of the Resources Agency, sued the county assessor and a property owner, alleging the assessor violated the Williamson Act. (*Id.* at p. 238.) The Williamson Act permits preferential tax assessment of land under a contract entered by the local government and a property owner that restricts the use of property to agriculture and open space. (*Sierra Club v. City of Hayward* (1981) 28 Cal.3d

8

840, 851 (*Sierra Club*).) In return for limiting the use of the land, "the landowner is guaranteed a relatively stable tax base, founded on the value of the land for open space use only and unaffected by its development potential." (*Ibid.*) Cancellation of a Williamson Act contract is permissible under limited circumstances and only upon payment of a cancellation fee. *(Sierra Club,* at p. 853.) The act requires a county, before approving a request to cancel such a contract, to determine the land's fair market value "as though it were free of the contractual restriction," and to set a cancellation fee based on an amount equal to 12.5 percent of that amount. (Gov. Code, § 51283, subds. (a), (b).) In *Triplett,* the state contended the county assessor violated the Williamson Act by applying the comparable sales method, using six properties that were all used for open dry-land farming and four that were subject to Williamson Act contracts, in calculating the cancellation value for plaintiffs' parcel of land. (*Triplett,* at p. 239.) The issue was whether the Williamson Act required the county assessor instead to value the property based on its full market value for the purpose the property owner sought to use it—as a destination resort and residential real estate project. (*Triplett,* at pp. 238-239.)

As relevant here, *Triplett* addressed an appeal from a trial court decision holding that the state lacked standing to challenge the cancellation valuation adopted by the local assessor. (*Triplett, supra,* 48 Cal.App.4th at pp. 252-256.) In discussing the state's standing, and more particularly, an argument that the cancellation valuation is "a matter to be resolved by the County assessment appeals board," the court observed the issue was not valuation of the property but "whether the Assessor followed the law when it determined the cancellation valuation." (*Id.* at p. 255.) By filing a general demurrer, the court said, "the Assessor admits for purposes of the resolution

9

of the questions of law presented that it did not follow the law when it determined the cancellation value." (*Id.* at pp. 255-256.)

It is not altogether clear from the discussion whether the court in *Triplett* meant the Assessor was admitting the facts on which the question of whether it followed the law was based, or admitting that what it did was contrary to the law.[4] But even assuming the court was stating that the demurrer had the effect of admitting legal conclusions asserted in the complaint, the statement was dicta and, in any event, contrary to the well-established rule that, "For the purpose of testing the sufficiency of the cause of action, the demurrer admits the truth of all *material facts properly pleaded* (i.e., all ultimate facts alleged, but *not contentions, deductions or conclusions of fact or law*)." (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2022) ¶ 7:43, second italics added); see *People ex rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 300-301 [" 'We do not, however, assume the truth of contentions, deductions, or conclusions of fact or law' "]; *Denny v. Arntz* (2020) 55 Cal.App.5th 914, 919-920.)

We agree with 290 Division's assertion that the value of real property is generally a question of fact. (*County of Los Angeles v. Southern Cal. Edison Co.* (2003) 112 Cal.App.4th 1108, 1121.) However, the first amended complaint does not allege that the value of the Property was $52 million as a pure matter of fact. Rather, it alleges that "the City agreed that the value of the Property was $52 million *if section 402.1 does apply*, or $63.1 million if section 402.1 does not apply." (Italics added.) It further asserts that "the Property should have been valued at $52 million" and that "the assessment

---

[4] In the preceding paragraph, the court stated the well-established rule that, "[b]y filing general demurrers to the action, the respondents have admitted the truth of all material factual allegations of the action." (*Triplett, supra,* 48 Cal.App.4th at p. 255.)

by the City and the decision of the [AAB] are contrary to section 402.1 and are not supported by precedent." These allegations hinge entirely on the only real question, which is whether the leaseback of the property to the local government is an enforceable restriction within the meaning of section 402.1. That is a question of law we decide de novo.

### III.

### *Principles of Statutory Interpretation*

Before turning to the merits, we briefly discuss the well-settled principles of statutory interpretation. This process involves up to a three-step inquiry in which "we first look to the plain meaning of the statutory language, then to its legislative history and finally to the reasonableness of a proposed construction." (*Riverview Fire Protection Dist. v. Workers' Comp. Appeals Bd.* (1994) 23 Cal.App.4th 1120, 1126.)

Under the first step, we look to the chosen words in the statute as they are the most reliable indicator of the Legislature's intent. "We give the words of the statute 'a plain and commonsense meaning' unless the statute specifically defines the words to give them a special meaning. [Citations.] If the statutory language is clear and unambiguous, our task is at an end, for there is no need for judicial construction." (*MacIsaac v. Waste Management Collection & Recycling, Inc.* (2005) 134 Cal.App.4th 1076, 1083 (*MacIsaac*).)

However, as our high court held, "the 'plain meaning' rule does not prohibit a court from determining whether the literal meaning of a statute comports with its purpose or whether such a construction of one provision is consistent with other provisions of the statute. The meaning of a statute may not be determined from a single word or sentence; the words must be construed in context, and the provisions relating to the same subject matter must be harmonized to the extent possible." (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735.) Moreover, the plain meaning of the statute is not to be

11

followed when it would "frustrate[] the manifest purposes of the legislation as a whole or [lead] to absurd results."  (*People v. Belleci* (1979) 24 Cal.3d 879, 884.)

If an analysis of the plain meaning of the statute does not resolve the issue, courts then proceed to the second step of the inquiry, which includes looking at the statute's legislative history, among other extrinsic aids, to assist with statutory interpretation.  (*MacIsaac, supra,* 134 Cal.App.4th at p. 1083.)  Although the language of section 402.1, when read as a whole, is clear enough, the legislative history of section 402.1 further supports our interpretation and resolves any lingering ambiguity in favor of the City.

**IV.**

***The Subject Lease Is Not an Enforceable Restriction Under Section 402.1.***

**A. Property Tax Background**

In California, "[a]ll property is taxable and shall be assessed at the same percentage of fair market value."  (Cal. Const., art. XIII, § 1, subd. (a).) "Fair market value" or "full cash value" is defined as "the amount of cash or its equivalent that property would bring if exposed for sale in the open market under conditions in which neither buyer nor seller could take advantage of the exigencies of the other, and both the buyer and the seller have knowledge of all of the uses and purposes to which the property is adapted and for which it is capable of being used, and of the enforceable restrictions upon those uses and purposes."  (§ 110.)  As stated in the State Board of Equalization's regulation, "When applied to real property, the words 'full value', 'full cash value', 'cash value', 'actual value' and 'fair market value' mean the price at which the unencumbered or unrestricted fee simple interest in the real property (subject to any legally enforceable governmental

12

restrictions) would transfer for cash or its equivalent under the conditions set forth in the preceding sentence."  (Cal. Code Regs., tit. 18, § 2.)

The "fair market value" of a property is properly determined "by considering the value of the fee simple absolute which includes the combined interests of [all parties involved]."  (*Carlson v. Assessment Appeals Bd. I* (1985) 167 Cal.App.3d 1004, 1013 (*Carlson)*.)  And although parties to a purchase transaction may hold different legal interests, "assessors usually enter the entire value of land and improvements on the tax roll without distinction between possessory and reversionary interests" since it is the property itself that is subject to taxation.  (*De Luz Homes v. County of San Diego* (1955) 45 Cal.2d 546, 563.)  "Separate legal interests in property . . . will not affect the manner of assessment, because the assessment is against the property itself, and . . . payment of the tax should be a matter of 'private arrangement' among the owners of various interests in the property." (*Carlson*, p. 1013, quoting *De Luz*.)

"A fundamental principle in appraising property, both for tax purposes and in condemnation, is that property is to be valued 'in view of all the purposes to which it is naturally adapted.'  This means the uses by potential purchasers generally, not the particular use by the present owner.  The fact that the owner is using the property for a less valuable use, or not using it at all, is generally irrelevant."  (2 Flavin, Taxing Cal. Property (4th ed. 2018) General Valuation Principles, § 17:6, p. 17-16, fns. omitted.)

Consistent with these principles, where private parties restrict a property's use, such as by encumbering property with a lease at below-market rent, such privately imposed restrictions are not considered in determining the property's value for taxation purposes.  (*Clayton v. County of Los Angeles* (1972) 26 Cal.App.3d 390, 392-396; *Dennis v. County of Santa*

13

*Clara* (1989) 215 Cal.App.3d 1019, 1026-1031; Cal. Code Regs., tit. 18, § 4, subd. (b)(2) ["When appraising an unencumbered-fee interest, . . . (2) convert the sale price of a property encumbered with a lease to which the property remained subject to its unencumbered-fee price equivalent by . . . adding to the price of the seller's equity the amount by which it is estimated that the lease depressed that price"]; see also *Carlson*, *supra,* 167 Cal.App.3d at p. 1013.) The rule comports with the constitution's command that property be valued, for tax purposes, at its "fair market value." Further, as the Presiding Justice Kaus observed in *Clayton*, "[T]he question is whether because plaintiffs made a bad lease with the May Company, the property must be assessed at a lower figure than would be appropriate if they had not given up their right to possession or had negotiated for the going rent." (*Clayton*, at p. 392, fn. omitted.) If the answer were yes, it would mean "an owner who does not 'command the full potential of his property [could] expect his fellow taxpayers to compensate him for the difference.'" (*Id.* at p. 392, fn. 3.)

There is a qualification to this general rule, which is that "[t]he highest and best use must be a *legally permitted use*, unless it can be shown that there is a 'reasonable probability' that the restriction will be altered in the near future." (2 Flavin, Taxing Cal. Property, *supra*, § 17:6, at p. 17-17, italics added.) Stated otherwise, "Ownership of title in fee simple absolute includes the rights, *subject to governmental restrictions*, of full use and disposition of the property." (*Carlson*, *supra*, 167 Cal.App.3d at p. 1013, italics added.) "This rule, first established in condemnation, has long been utilized by assessors and has been codified with the addition of [section] 402.1 to the Revenue and Taxation Code . . . ." (2 Flavin, *supra*, § 17:6, at p. 17-17.)

14

Section 402.1, subdivision (a) provides that "[i]n the assessment of land, the assessor shall consider the effect upon value of any enforceable restrictions to which the use of the land may be subjected."  A non-exhaustive list of such restrictions is then provided that includes zoning (§ 402.1, subd. (a)(1)), "[r]ecorded contracts with governmental agencies" (*id.*, subd. (a)(2)), and environmental constraints (*id.*, subd. (a)(6)).  In *CAT Partnership*, *supra,* 63 Cal.App.4th at page 1084, the court noted that "enforceable restrictions have been described as virtually any governmental restriction designed to serve the interest of public health, safety, morals and/or general public welfare"—in other words, an exercise of the government's police power.

**B. Section 402.1 Does Not Apply Where the City Did Not Act in a Regulatory Capacity in Entering into a Contract.**

### 1.  *The Plain Meaning of Section 402.1*

There is no question that a below market lease would not be an "enforceable restriction" if the below market leasehold had been sought by a private party.  (*Carlson*, *supra*, 167 Cal.App.3d at p. 1014.)  But because the government is the party who leased back the property, the question is whether the leaseback should be considered a "recorded contract with a governmental agency" and therefore an "enforceable restriction" under section 402.1, subdivision (a)(2).  290 Division argues that there is no ambiguity in the phrase "recorded contract with a governmental agency" and its plain meaning should control.  Even assuming that phrase, read in isolation, has a "plain meaning," this is not the beginning and the end of the analysis.  There is also the language "enforceable restriction" and the list of examples that comprise such restrictions, of which "recorded contract with a government agency" is only one.  Again, "we do not view the language of [a] statute in isolation" but rather "construe the words of the statute in context,

15

keeping in mind the statutory purpose." (*MacIsaac, supra,* 134 Cal.App.4th at p. 1083.)

There are 11 enumerated examples of what constitutes an "enforceable restriction" under section 402.1, and the 10 others must inform our interpretation of the one at issue here, "recorded contracts with governmental agencies." We apply two related principles of interpretation. The first is *noscitur a sociis* which in English means " ' " 'a word takes meaning from the company it keeps' " ' " and its meaning may be " ' " ' " 'enlarged or restrained by reference to the object of the whole clause in which it is used.' " ' " ' " (*Almond Alliance of California v. Fish and Game Com.* (2022) 79 Cal.App.5th 337, 364.) The second is *ejusdem generis*, which means "when a statute contains a list or catalogue of items, a court should determine the meaning of each by reference to the others, giving preference to an interpretation that uniformly treats items similar in nature and scope." (*Moore v. California State Bd. of Accountancy* (1992) 2 Cal.4th 999, 1011-1012.)

The other enumerated examples under section 402.1 include zoning, land use permits, development controls, environmental constraints and hazardous waste land use restrictions. (§ 402.1, subd. (a)(3)–(7).) These are all forms of government regulation imposed under local and state government police power. If section 402.1, subdivision (a)(2), is construed in a manner consistent with the other examples, its language, "recorded contracts with governmental agencies," must mean contracts that have a regulatory or police power component. As we shall discuss further below, governments often employ contracts to achieve regulatory objectives, particularly in the realm of land use restrictions. The quintessential example is the Williamson Act contract, a land conservation agreement between a local government and a property owner restricting use of property to agricultural and other

compatible uses. (See *County of Colusa v. California Wildlife Conservation Bd.* (2006) 145 Cal.App.4th 637, 642 & fn. 4; Gov. Code, §§ 51240, 51242, 51244.) Others include wildlife habitat and scenic corridor contracts under Government Code sections 51205 and 51205.1 and historical property contracts under Government Code section 50280 et seq. However, unlike such conservation-oriented contracts, the leaseback agreement the parties entered here did not serve any police power purpose. Rather, as alleged, the transaction served only the economic needs of the buyer and seller. The leaseback was not a police power regulation of land use that constitutes an "enforceable restriction" under section 402.1, subdivision (a).

290 Division contends that section 402.1 has been amended at various times to include examples of enforceable restrictions that do not have a regulatory component. It points to provisions including conservation, trail and scenic easements granted in favor of a public agency *or a nonprofit corporation.* (§ 402.1, subd. (a)(8)(A).) We cannot agree with 290 Division's characterization of this provision, which requires that the easement's primary purpose must be "the preservation, protection, or enhancement of land in its natural, scenic, historical, agricultural, forested, or open-space condition or use." (*Ibid.*) Further, the easements that qualify are those described in Civil Code section 815.2 (§ 402.1, subd. (a)(8)(A)), which must be binding on successive owners of the land. (Civ. Code, § 815.1.) Such easements are thus permitted and afforded favorable tax treatment as a form of land use restriction for the benefit of the public, whether granted to a public agency or the specified types of nonprofit entities described in the statute.

The same is true of subdivision (a)(10) of section 402.1, on which 290 Division also relies. That subdivision addresses contracts between

17

property owners and certain non-profit corporations that restrict the use of property to affordable housing. (§ 402.1, subd. (a)(10).) This subdivision is conditioned on a finding by the local housing authority or an equivalent agency "that the long-term deed restrictions in the contract serve a public purpose." (*Id.*, subd. (a)(10)(D).) Finally, 290 Division cites section 402.1, subdivision (a)(11), which covers long-term ground leases between community land trusts and qualified owners of owner-occupied dwellings that include affordability restrictions. Again, a public agency must find "that the affordability restrictions in the contract serve the public interest to create and preserve the affordability of residential housing" for low to moderate income families. (*Id.*, subd. (a)(11)(A)(iii).)

290 Division argues that since the Legislature added a public interest requirement to only certain subdivisions but not to others, it must not have intended for subdivisions like section 402.1, subdivision (a)(2), to include a public interest component at all. We are not persuaded. To the contrary, prior to the above amendments, the examples under section 402.1 consisted solely of restrictions imposed directly by government. (See *Carlson, supra*, 167 Cal.App.3d at p. 1010.) Examples like permits, zoning and environmental constraints are plainly governmental activities and it is self-evident that such activities serve the interests of the public. There was therefore no need for the Legislature to include a public interest requirement in the subdivisions setting forth these types of land use restrictions. Contracts between *private* parties, on the other hand, even nonprofit entities, do not always or necessarily serve the government's public policy interests. The requirement of an explicit finding by the relevant public agency ensures that such contracts serve public policies that have been adopted by the local government. They are a form of land use restriction that, though included in

18

a contract with a nonprofit agency, are sanctioned and treated favorably by the local government to serve public policies adopted by the government.

In short, these examples cited by 290 Division do not undermine—but instead support—the City's argument that all the subdivisions of the statute are designed to promote land use restrictions that serve government public policy goals. To interpret section 402.1, subdivision (a)(2), to include as an "enforceable restriction" a contract—public *or* private—that serves no public purpose would render that subdivision different from every other subdivision of the statute, contrary to the principles of *ejusdem generis* and *noscitur a sociis*.

This interpretation of section 402.1, subdivision (a)(2), is also supported by *CAT Partnership, supra*, 63 Cal.App.4th 1071. There, the Sixth District held that the restrictions on cable television rates imposed in a franchise agreement issued by a local government to a cable operator were enforceable restrictions within the meaning of section 402.1. (*Cat Partnership,* at pp. 1081, 1088.) In so holding, the court rejected the local assessor's assertion that section 402.1 applied only to land use restrictions. (*CAT Partnership*, at p. 1084.) However, its relatively broad interpretation of the phrase "enforceable restrictions" was not unbounded. As we have noted, it described "enforceable restriction" under section 402.1 as "virtually any government restriction designed to serve the interest of public health, safety, morals and/or general public welfare." (*CAT Partnership*, at p. 1084.) The rate restrictions in the cable franchise agreement served just such a broad public purpose, namely, to make cable television more accessible to the residents of Santa Cruz. (See *id*. at p. 1088 [rate protection provisions restrict what cable operators may charge their customers].) It is true that the parties in the case did not argue about whether the restriction in the

19

franchise agreement was designed to serve the general public welfare. Nonetheless, the language of the decision, even if not essential to the court's holding, supports that limit on the scope of section 401.2. *Carlson,* another Sixth District opinion that the court in *CATS Partnership* cited (*CATS Partnership*, at p. 1084), likewise supports such a limitation. (See *Carlson, supra,* 167 Cal.App.3d at pp. 1008, 1010 [rejecting claim that assessor had to consider private agreement between railroad and owner of property near railroad requiring its use for a warehouse and railroad spur because "no public policy regarding land use planning is involved" and "public derives no benefit whatsoever as a result of these particular restrictions"].)

### 2. *The Legislative History of Land Use Restrictions and Section 402.1*

The parties barely discuss the legislative history of section 402.1. 290 Division contends it is, in essence, irrelevant, because the language of subdivision (a)(2), which it reads in isolation, is "clear" and "unambiguous." In a heading, the City contends that the legislative history supports its position that the subject lease is not an enforceable restriction under section 402.1. The City's argument, however, is only that 290 Division cannot identify anything in the legislative history to support *its* position. In its reply brief, 290 Division in turn argues that the City fails to cite to any legislative history to support its position that the subject lease is not an enforceable restriction. In sum, both parties refer to legislative history in their briefs and had the opportunity to discuss it, but failed meaningfully to do so.

Although our analysis of the language of the statute considered as a whole under the first step of the inquiry suffices to resolve the interpretation issue, we find further support in the legislative history of the statute, which

eliminates any possible doubt. We therefore proceed to the second step of the inquiry.

Before delving into the history of section 402.1 in particular, some background history is in order. For much of the 20th century, California's "planning infrastructure revolved around the single question of how to consume more undeveloped land." (Fulton & Shigley, Guide to Cal. Planning (5th ed. 2018) p. 4 (Guide).) "The decisional guide to valuation which equates 'highest' with 'most profitable' use . . . evolved [at that time] before the advent of legislation designed to protect open-space and environmentally restricted lands from conventional tax valuation methods." (*Dressler v. County of Alpine* (1976) 64 Cal.App.3d 557, 567, fn. 5.) It also predated the widespread use and acceptance of comprehensive zoning in the early 20th century. (See *Miller v. Board of Public Works of Los Angeles* (1925) 195 Cal. 477, 485-486 [discussing growth of sentiment in favor of comprehensive zoning in early 20th century].)

By the 1950s and 1960s, however, "[m]ost of the planning reform activity undertaken . . . dealt with the regional and statewide consequences of growth." (Guide, *supra,* at p. 60.) As an early example, "[l]egislative interest in preserving agricultural lands from urban encroachment first surfaced in 1955 with the passage of the Greenbelt Law (Gov. Code, § 35009) to prevent annexation of lands 'zoned and restricted for agricultural purposes exclusively,' without owner consent." (*Santa Catalina Island Conservancy v. County of Los Angeles* (1981) 126 Cal.App.3d 221, 239 (*Santa Catalina*).)

Turning to the legislative history, it was in 1957, two years after the Greenbelt law was passed, that section 402.1's roots took hold. "An effort at providing tax relief followed [the Greenbelt law] with the enactment of former Revenue and Taxation Code section 402.5 . . . which directed county assessors

21

to assess exclusively agricultural land at its use value, providing that 'there is no reasonable probability of the removal or modification of the zoning restriction within the near future.' " (*Santa Catalina, supra,* 126 Cal.App.3d at p. 239.)

In 1965, the Legislature enacted the Land Conservation Act of 1965 (Gov. Code, §§ 51200 et seq.), also known as the Williamson Act, which, as we have discussed, enabled local governments to enter long-term contracts with landowners willing to restrict specific parcels of land to agricultural or open space use. The act's stated purposes include the "preservation of a maximum amount of the limited supply of agricultural land" and "discouragement of premature and unnecessary conversion of agricultural land to urban uses." (Gov. Code, § 51220, subds. (a), (c).) After these long-term contracts were entered into, "the lands must be assessed for city or county tax purposes according to the restricted land use, not necessarily the highest and best use." (*Kelsey v. Colwell* (1973) 30 Cal.App.3d 590, 592.)

Our Supreme Court explained, "The Williamson Act was the Legislature's response to two alarming phenomena observed in California: (1) the rapid and virtually irreversible loss of agricultural land to residential and other developed uses [citations], and (2) the disorderly patterns of suburban development that mar the landscape, require extension of municipal services to remote residential enclaves, and interfere with agricultural activities." (*Sierra Club, supra,* 28 Cal.3d at p. 850, fn. omitted.) The Legislature surmised that these problems were caused in part by "the self-fulfilling prophecy of the property tax system: taxing land on the basis of its market value compels the owner to put the land to the use for which it is valued by the market. As the urban fringe approaches, the farmer's land becomes valuable for residential development. His taxes are therefore

22

increased, although his income is likely to shrink . . . . Often the farmer is forced to sell his land to subdivision developers, sometimes long before development is appropriate." (*Ibid.*)

The Williamson Act was followed one year later by Senate Constitutional Amendment No. 3, which amended the California Constitution to add Article XXVIII (later moved to Article XIII, section 8) to "authorize[] the Legislature to: (1) Define 'open space lands'; (2) specify *enforceable use restrictions* for recreation, enjoyment of scenic beauty, use of natural resources, or production of food or fibre; (3) provide criteria to determine when land is subject to *such specified use restrictions*, and (4) define the measure of value consistent with *such use restrictions*." (*Santa Catalina, supra,* 126 Cal.App.3d at p. 240, italics added and omitted.) "Article XXVIII was adopted to uphold the legislative scheme by eliminating the tax controversy which came into existence after the plan became effective; the amendment reconciled assessments based on restricted agricultural and similar land uses with preexisting constitutional requirements that property be assessed at its full cash value." (*Kelsey v. Colwell, supra,* 30 Cal.App.3d at p. 595.)

Promptly following that constitutional amendment, the Legislature repealed section 402.5 (Stats. 1966, ch. 147, § 34.2) and replaced it with section 402.1, expanding the category of covered property from property zoned and restricted to agricultural use to "land" "subjected" to "*enforceable restrictions*" regarding its "use." (Stats. 1966, ch. 147, § 34.1, italics added.) This new section expressly added "zoning restrictions limiting the use of land and any recorded contractual provisions limiting the use of lands entered into with a governmental agency pursuant to state laws or applicable local ordinances." (*Ibid.*) The Legislature also included a statement of its purpose

23

and intent in enacting this statute, which was "to avoid an assessment policy which, in the absence of special circumstances, considers uses for land which *legally are not available to the owner and not contemplated by local government*" and declared "that these sections are necessary to implement *the public policy of encouraging and maintaining effective land use planning*." (*Ibid.*, italics added.) This stated purpose remains in effect today. (§ 402.1, subd. (g).)

The proximal relationship among the adoption of the Williamson Act, the 1966 constitutional amendment, the enactment of section 402.1 and the inclusion of statement of purpose to the tax law—coupled with the use of the language "enforceable use restrictions" and "enforceable restrictions" and the expression of public policy encouraging land use planning—shed considerable light on what the Legislature intended by the language it used when it adopted section 402.1. "Enforceable restrictions," including "contracts" were land use restrictions imposed by local government, either by legislation or contract, for the purposes of advancing important police power objectives such as encouraging agricultural use, maintaining open space, preserving scenic beauty and encouraging recreational use. That intention was reinforced as time went on.

In subsequent years, the Legislature amended section 402.1 time and time again to address newly enacted conservation and environmental laws and to add other categories of "enforceable restrictions" while retaining the original categories of zoning and contracts with government agencies that restrict land use. As we have discussed in describing the statute as a whole in its current incarnation, the enforceable restrictions were all designed to

advance public policies touching on land use.[5]  Notably, these many amendments left unchanged the Legislature's original statement of purpose that includes "the public policy of encouraging and maintaining effective land use planning."  (§ 402.1, subd. (g).)  This stated purpose as well as the legislative history of section 402.1 reinforces our conclusion that the subject lease, entered into by the City in its proprietary capacity and not for a public purpose served by land use legislation, is not the type of contract contemplated under section 402.1, subdivision (a)(2).  The lease between 290 Division and the City is therefore not an enforceable restriction that the assessor is obligated to consider in the assessment of the Property for tax purposes.

## C. The First Amended Complaint Fails to Allege That the Lease Was an Exercise of Regulatory Power.

290 Division next argues that even if the City must be advancing a government or police power goal or, stated otherwise, acting in a regulatory

---

[5]  See Stats. 1974, ch. 857, § 1 [adding permits issued by governmental agencies exercising land use powers, state and regional commissions formed pursuant to state statutes (coastal commissions, Bay Conservation and Development Commission and Tahoe Regional Planning Agency), and "environmental constraints applied to the use of land pursuant to provisions of statutes"]; Stats. 1989, ch. 906, §§ 1, 12, 14 [adopting hazardous waste legislation providing for hazardous waste land use restrictions, amending section 402.1 to add "[h]azardous waste land use restriction pursuant to [statute]" (restrictive easements, covenants, restrictions, or servitudes)]; Stats. 1993, ch. 1002, § 1 [adding "recorded conservation, trail or scenic easement as described in Section 815.1 of the Civil Code, that is granted in favor of a public agency or in favor of a nonprofit corporation . . . that has as its primary purpose the preservation, protection, or enhancement of land in its natural, scenic, historical, agricultural, forested, or open-space condition or use"]; Stats. 2015, ch. 639, §§ 1-6 [adopting Greenway Development and Sustainment Act and amending section 402.1 to add "[a] recorded greenway easement" under act].)

25

capacity for section 402.1 to apply, it has alleged that the City's insistence on paying a below market rent under the leaseback did advance a governmental objective and thus was an exercise of its police power. Specifically, the first amended complaint alleges that the "rent limitation" "serv[es] the interest of public health, safety, morals and/or general public welfare." The first amended complaint alleged that the leaseback "allowed the City employees to continue working at the Property and thus contribute to the area's role as a center of government activity . . . which served the interest of public health, safety, morals and/or general public welfare." It further alleged that the leaseback "allowed the City to receive $52 million for the Property with which the City could finance the building at 1500 Mission Street . . . which further served the interest of public health, safety, morals, and/or general public welfare." Again, in reviewing a demurrer, we do not accept conclusions of fact or law as true, which includes allegations by 290 Division that the lease served a public interest. (*Blank v. Kirwan*, *supra,* 39 Cal.3d 311, 318.)

The power to regulate, otherwise known as "the police power," "is simply the power of sovereignty or power to govern—the inherent reserved power of the state to subject individual rights to reasonable regulation for the general welfare." (8 Witkin, Summary of Cal. Law (11th ed. 2022) Constitutional Law, § 1098, p. 590.) No doubt, the subjects of local police power regulation are broad, encompassing regulations of land use, use of streets, business operations, animal care, health and safety, and more. (*Id*., § 1107, pp. 601-602.) Nonetheless, the parties have cited no case suggesting that a city's lease of a building for its own use is an exercise of police power. " 'The term "police power" connotes the time-tested conceptional limit of public encroachment upon private interests. . . . Except for the substitution of the familiar standard of "reasonableness," this Court has generally

refrained from announcing any specific criteria. . . . "To justify the state in . . . interposing its authority in behalf of the public, it must appear—First, that the interests of the public . . . require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals." ' " (*Id.*, § 1100, p. 591, quoting *Goldblatt v. Hempstead* (1962) 369 U.S. 590, 594-595.)

Here, 290 Division has not alleged *facts* suggesting that in entering the contract to sell and lease back the building it owned to the highest bidder, the City was advancing public health, safety or morals. This case is unlike *CAT*, *supra*, 63 Cal.App.4th at page 1084, in which the limitation imposed on the rate the franchisee could charge for the cable services it offered was not for the direct benefit of the government itself but rather served the interest of the residents at large (or at least any who chose to purchase cable television service). Here, the City itself, and not the public at large, reaped the savings created by the agreed-upon below market rent. While a local government budget that saves money in one way or another may indirectly allow it to advance the interests of the public, such savings do not directly advance any public policy of the City or redound to the benefit of its citizens. To treat every government contract that has economic value as an exercise of governmental or police power as 290 Division in essence suggests, would stretch those concepts beyond recognition.

In short, 290 Division has not alleged any facts that convert the City's exercise of its contracting power into a police power regulation of the kind addressed by section 402.1. The trial court therefore did not err in sustaining the demurrer.

## V.

### *Leave to Amend Was Properly Denied.*

Finally, 290 Division argues that the trial court erred in denying its request for leave to amend. When a demurrer is sustained without leave to amend, we "consider whether the complaint might state a cause of action if a defect could reasonably be cured by amendment . . . . The plaintiff bears the burden of demonstrating a reasonable possibility to cure any defect by amendment." (*Lazar v. Hertz Corp.* (1999) 69 Cal.App.4th 1494, 1501.) 290 Division has not met this burden here.

At the demurrer hearing, 290 Division requested leave to amend to "add more about the leases." This was made in response to the trial court's comments that the subject lease was a just commercial lease and that the City's argument was "no different than any other private party for purposes of these leases." The trial court denied this request and commented that adding more about the leases would not bear on the statutory interpretation issue.

290 Division argues on appeal that it "should have been allowed to plead additional facts about the Lease." No further explanation is provided as to what specific amendments 290 Division would make to allege that the City acted in a governmental or regulatory capacity. We also note that 290 Division already had an opportunity to cure the defect as it filed a first amended complaint following the City's demurrer to the complaint. As the first amended complaint added specific allegations as to how the City's sale of the Property and leaseback served a public interest, 290 Division has already attempted to allege a regulatory component to the City's activities. This attempt was unsuccessful and we do not believe that any further amendment will reasonably cure this defect.

28

## DISPOSITION

The judgment is affirmed.  Respondent shall recover its costs on appeal.

_____<br>STEWART, P.J.

We concur.

_____
RICHMAN, .J.

_____
MILLER, J.

*290 Division (EAT), LLC v. City and County of San Francisco* (A162055)

Trial Court:  San Francisco County Superior Court

Trial Judge:  Hon. Ethan P. Schulman

Counsel:

Baker Botts, Jon D. Feldhammer, Benjamin C. Koodrich for Plaintiff and Appellant.

David Chiu, City Attorney, Scott M. Reiber, Chief Tax Attorney, Carole F. Ruwart, Kevin Yeh, Ronald H. Lee, Deputy City Attorneys, for Defendant and Respondent.